**In re James A. FISHER, Debtor.**

**Ruth A. Slone, Trustee, Plaintiff–Appellee,**

v.

**Rhonda Brennan, et al., Defendants–Appellants.**

No. 3:–06–cv–070.
Bankruptcy No. 03–33161.
Adversary No. 04–3092.

United States District Court,
S.D. Ohio,
Western Division at Dayton.

Jan. 29, 2007.

Ira Rubin, Dayton, OH, James M. Hill, James M. Hill Co., Beavercreek, OH, for Defendants–Appellants.

Stephen D. Brandt, Dayton, OH, for Plaintiff–Appellee.

William Alfred Clark, Dayton, OH, for Bankruptcy Court.

## ENTRY AND ORDER AFFIRMING BANKRUPTCY COURT'S DECISION

ROSE, District Judge.

The matters now before the Court are appeals taken from a Decision entered by United States Bankruptcy Judge William A. Clark on January 20, 2006 (the "Order"). The Order (doc. # 124) was issued in an adversary proceeding (Adv. Proc. # 04–3092) brought by Ruth A. Slone as Trustee for James A. Fisher ("Fisher"), the debtor in the underlying bankruptcy action. The Adversary Proceeding was brought against Fisher and Rhonda Brennan ("Brennan") (collectively the "Defendants").

The Order grants judgment to the Defendants on multiple cash transfers between them and judgment to the Trustee on the transfer of an inventory from Fisher to Brennan. Both the Trustee and the Defendants now appeal the Order.

Appeals from the final judgments and orders of bankruptcy courts are governed by 28 U.S.C. § 158 and Bankruptcy Rules ("BR") 8001 *et seq.* In this case, both the Trustee and the Defendants have elected, pursuant to the preceding authority, to have their appeals heard by this Court. This Court, therefore, has jurisdiction to adjudicate the appeals.

The two appeals were initially filed under different case numbers in this Court. They have since been consolidated into one case under the above caption. (Doc. # 14.)

## I. THRESHOLD ISSUES

There are two threshold issues that must be addressed before analyzing the appeals. The threshold issues will be addressed seriatim.

### A. Motion To Strike

First, the Defendants/Appellants have moved to strike Appellee's Reply Brief or to file a response to the sur-reply portion of that brief. (Doc. # 23.) Federal Rule of Bankruptcy Procedure 8009 specifically permits an Appellant to file a brief, an Appellee to file a response and the Appellant to file a reply thereto. Neither local rules nor the Federal Rules of Bankruptcy Procedure permit the filing of a sur-reply without leave of court. If the Appellee has filed a cross appeal, as is the case here, the Appellee's response to the Appellant's Brief is to contain Appellee's cross appeal arguments. Appellant may then file a response and the Appellee may file a reply to Appellant's response to the issues presented on cross appeal.

In this case, the Appellants filed their initial Brief on the issues that they raise on appeal. This was followed by the filing of Appellee's Brief which includes a response to Appellant's initial brief and argument on the issues that Appellee raises on cross appeal. The Appellants then filed a reply to their brief and a response to the issues raised by the Appellee on appeal. At this point, the Appellants' issues were fully briefed. Appellants had filed a brief,

Appellee a response and Appellants a reply.

The Appellee then filed a Reply Brief that includes a reply to Appellants' response to the issues raised by Appellee on appeal. At this point, Appellee's issues were fully briefed. However, the Appellee's Reply brief also again addresses Appellants' issues on appeal which is essentially a sur-reply on those issues. Further, this sur-reply was filed without leave of court.

The Appellee now admits that she filed a reply brief without leave of court. She also argues that she was able to do so without leave of court because the Appellants added two new arguments in their reply.

■ Because Appellee filed a reply brief without leave of court, the portion of Appellee's Reply Brief that addresses Appellants' issues on appeal is struck and will not be considered. Also, arguments made for the first time in a reply brief are not to be considered on appeal. *Wright v. Holbrook*, 794 F.2d 1152, 1156 (6th Cir.1986). Therefore, new issues raised by the Appellants in their reply will not be considered unless they otherwise would have been considered by the Court as part of its analysis.

Appellee's sur-reply will not be considered. To that extent, Appellants' motion to strike (doc. #23) is GRANTED. Finally, in her response to Appellant's motion to strike, the Appellee argues that the Appellants have raised arguments on appeal that the trial court did not hear. To the extent this argument is made in the briefs that have not been struck, it will be considered. Otherwise, it will not be considered to have been properly raised.

## B. The Use of Deposition Testimony

■ The second threshold issue raised by the Parties is the use of deposition testimony. The Appellants argue that the trial court incorrectly relied upon deposition testimony in reaching its decision because Fisher's deposition transcript was not offered as evidence. The Appellee responds that this issue was raised in post trial briefing, was rejected by the trial court and should be overturned only if the trial court abused its discretion.

The trial court "relied heavily on the written evidence in issuing the findings of fact in this case." (Order 4.) Specifically, the trial court relied upon written evidence "in the form of financial summaries provided by the parties, e-mail and memoranda documentation between Fisher and his new employer Globe Products, Inc. . . . ." as providing "the only reliable evidence regarding the intent of the parties at the time of the transaction." (*Id.*) Further, the trial court determined that deposition testimony was properly utilized at trial (Order 5.)

The Federal Rules of Evidence provide that any deposition may be used by a party for impeachment of the deponent or for any other purpose permitted by the Federal Rules of Evidence. Fed.R.Civ.P. 32(a)(1). The Appellants argue that deposition testimony that is used only for impeachment is not substantive evidence. However, this is true only if the deponent does not testify at the trial and is not, therefore, subject to cross examination. See 8A Charles Alan Wright, Arthur R. Miller and Richard L. Marcus, *Federal Practice and Procedure* § 2144 (2d ed.1994) (an example of where another purpose is permitted by the Fed.R.Evid. is Rule 801(d)(1) which makes a prior statement of a witness admissible if the declarant testifies and is subject to cross examination). In this case, Fisher, the deponent, testified at trial and was subject to cross examination. Therefore, the portion of Fisher's deposition testimony that

was used for impeachment is admissible as substantive evidence.

Deposition testimony was used for impeachment of the deponent and was, therefore, admissible as evidence. Further, there is no indication that the trial court used deposition testimony other than the deposition testimony introduced at the trial for impeachment of the deponent. Finally, to the extent that the Parties rely upon deposition testimony that was not permitted to be introduced at trial, it will be disregarded.

## II. FACTUAL BACKGROUND

The undisputed facts as set forth in the Record On Appeal, which has been supplemented by the Trustee, are as follows:

### A. Fisher and Fisher Data Products

Fisher is an engineer who formed Fisher Data Products ("FDP") in August of 1994. FDP manufactured test equipment for commercial grade motors.

FDP is an Ohio "Subchapter S" corporation and Fisher was the sole shareholder. Fisher was also the sole shareholder of JF Properties, LLC, which owned the real estate where FDP was located.

Both FDP and Fisher were in financial trouble by 1999. FDP had borrowed money from several financial institutions including National City Bank ("NCB"), County Corporation and the National Center for Industrial Competitiveness Capital Fund ("NCIC"). Fisher guaranteed most of the loans made to FDP. In addition, Fisher personally borrowed substantial sums of money from NCB and from his parents.

FDP began defaulting on its loans in 2000 and 2001. Among the loans in default was a loan from NCB to FDP. NCB instituted a lawsuit on the loan in 2002 and took a judgment against Fisher and FDP in November of that year. NCB was secured by FDP's accounts receivables, FDP's inventory and equipment and by the commercial building owned by JF Properties. FDP was dissolved shortly thereafter.

In early 2003, Fisher began working for Globe Products, Inc. ("Globe"). On April 16, 2003, Fisher filed for personal bankruptcy.

### B. Fisher and Brennan

Fisher and Brennan met in 1998 when Brennan was employed by FDP in sales and marketing. In 2000, Fisher and Brennan became romantically involved and in November of 2001, Fisher moved into Brennan's home.

In May of 2002, Brennan purchased a new home on Schantz Avenue in Oakwood. From that time forward, the two cohabitated at the Schantz Avenue location.

Brennan's responsibilities at FDP increased until July of 2002 when she took a voluntary layoff. She was then unemployed until January of 2003 when she began working for Globe on a contract basis.

As cohabitants, Fisher and Brennan shared financial responsibilities. They each describe a living arrangement in which they shared financial responsibilities for the household including payment of the monthly mortgage, utilities and general living expenses. Both Fisher and Brennan had children and indicate that they shared the expense of raising those children.

Fisher and Brennan had a number of financial transactions between themselves while they were cohabitating and prior to Fisher's bankruptcy. These transactions can be divided into two groups: those that occurred prior to April 15, 2002 and those that occurred between April 16, 2002, and April 16, 2003. The April 15, 2002 date is significant because it is one year before Fisher filed for bankruptcy.

The record indicates a total of eighty-seven transfers. Eight of those transfers occurred between December 7, 2000, and April 15, 2002. Of these eight, three were from Fisher to Brennan and five were from Brennan to Fisher. These transfers were all $1,000 or more and were in increments of $1,000. The transfers from Brennan to Fisher totaled $15,000 and those from Fisher to Brennan totaled the same.

Seventy-nine of the transfers occurred between April 16, 2002 and April 16, 2003, the year prior to Fisher's bankruptcy filing. Of these seventy-nine transfers, sixteen were from Fisher to Brennan and sixty-three were from Brennan to Fisher. The transfers range in amount from $20 to $11,000. The total amount transferred from Fisher to Brennan was $33,233.11 and the total amount transferred from Brennan to Fisher was $34,600.98.

## C. Inventory Transaction Between FDP and Brennan

As of November 2002, FDP was no longer a viable business entity but did have assets in the form of inventory, outstanding orders and patents. The inventory was designed to be used with certain patents which were ultimately sold to Globe.

In December 2002, Fisher began negotiations with Globe, one of FDP's competitors. The negotiations were initially for Globe's purchase of FDP. The negotiations evolved into discussions of Fisher's future employment with Globe and Globe's purchase of parts to complete some of FDP's backlog of orders.

As a result of these discussions, Globe asked Fisher to approach NCB with the idea that NCB would assign the inventory to Globe and Globe would purchase the inventory on an as-needed basis. However, NCB had no interest in this arrangement because it had no place to store the inventory. Further, Globe decided that it did not want to purchase the inventory in its entirety.

In January of 2003, Fisher began working for Globe on a contract basis. Shortly after Globe employed Fisher, Brennan sent a letter to NCB offering to purchase for $3,800 FDP's inventory, certain shelving units and a conveyor. The inventory had been appraised by NCB at $3,000. Mr. Loffer, who was a special asset administrator for NCB, responded to Brennan that, although NCB held a security interest in the inventory, FDP still owned the inventory and any offer to purchase the inventory needed to be made to FDP.

Thus, on January 30, 2003, when both Fisher and Brennan were employed by Globe, Brennan sent a letter to Fisher offering to purchase the inventory, certain shelving units and a conveyor from FDP for $3,850. Fisher accepted the offer and Brennan purchased the inventory, certain shelving units and a conveyor for $3,850 by check dated February 3, 2003.

Globe then purchased a portion of the inventory from Brennan for $10,326.11 on February 7, 2003. Globe continued to purchase the inventory on an as needed basis. The amount paid by Globe to Brennan totaled $99,128.65 through October 2004. Brennan used the profits from the sale of the inventory for supplemental income, jewelry, vacations, and other typical personal expenses. She also expended a significant amount of money to make what she termed "gifts" to former FDP employees.

## III. PROCEDURAL HISTORY

Fisher filed his petition for bankruptcy on April 16, 2003. Subsequently, the Trustee brought an adversary proceeding against Fisher and Brennan.

The Trustee's Complaint alleges that Brennan received fraudulent and preferen-

tial transfers in the form of money and property from Fisher in the time preceding his bankruptcy filing. The Trustee requests that the monetary transfers be set aside, that the property be returned to the estate, and, if appropriate, that the Trustee be granted a judgment in the amount of the proceeds of the sale of the property. The Trustee also requested costs, attorney's fees and punitive damages.

The Defendants denied all of the allegations in the Trustee's Complaint and the matter was tried to the Bankruptcy Court on October 12 and 14, 2005. Following post-trial briefing and the Trustee's motion seeking leave to respond to issues raised in Brennan's Reply brief regarding the use of depositions in the decision, the Bankruptcy Court granted judgment to the Defendants on the multiple cash transfers between them and granted judgment to the Trustee on the transfer of the inventory to Brennan.

## A. The Order

The bulk of the trial testimony came from Fisher and Brennan whom the court found to be "completely lacking in credibility." The Bankruptcy Court found Fisher and Brennan's testimony to be, at times, "beyond reason," in conflict with each other and in conflict with their own earlier depositions. Given Fisher and Brennan's lack of credibility, the Bankruptcy Court "relied heavily on the written evidence in issuing the findings of fact...." Written evidence in the form of financial summaries provided by the parties, e-mail and memoranda documentation between Fisher and Globe provided the Bankruptcy Court with the only reliable evidence regarding the intent of the parties at the time of the transactions in question.

Most of the factual findings of the Bankruptcy Court are as set forth in the above factual background. In addition, the Bankruptcy Court found that Fisher treated FDP as his alter ego using FDP as a pass through entity. Fisher "consistently commingled the company's and his personal funds", "paid the company's debts from his personal finances and regularly transferred funds between his accounts and the company's accounts." Fisher "often used the company's credit card for personal expenses and then paid the debt with his own money."

Regarding Fisher and Brennan's relationship, the Bankruptcy Court found that, "as partners living together, Fisher and Brennan shared financial responsibilities." "They shared financial responsibilities for the household, each paying a portion of their expenses including the monthly mortgage, utilities, and general living expenses."

The Bankruptcy Court then separated the transfers between Brennan and Fisher into two groups. The first is a "large number of fund transfers back and forth between Fisher and Brennan that occurred between December 2000 and April 2004." The second transfer is Brennan's purchase of the FDP inventory.

Regarding the "large number of fund transfers," the Bankruptcy Court found that Brennan transferred more money to Fisher than Fisher transferred to Brennan, and that, while Fisher and Brennan's testimony was evasive and contradictory, it "was not indicative of preferential or fraudulent intent" with regard to the transfers. The Bankruptcy Court determined that the "large number of fund transfers" were "simply transfers made between two people living together and working to pay the living expenses of the household." In sum, the Bankruptcy Court determined that the evidence presented was insufficient to prove the elements of preference or fraudulent transfer and Fisher received reasonably equivalent

880

value for each of the transfers. In addition to the testimony, the Bankruptcy Court found that the numbers alone, prove that Fisher received reasonably equivalent value for the transfers he made to Brennan.

Regarding Brennan's purchase of the FDP inventory, the Bankruptcy Court first determined that, after the financial demise of FDP, Fisher began negotiations with Globe, one of FDP's competitors. The parties began negotiating Globe's purchase of FDP and evolved to discussions of Fisher working for Globe and Globe purchasing the FDP inventory.

The deal was consummated by Fisher's employment at Globe and with Globe purchasing several of FDP's patents but not the inventory. The Bankruptcy Court determined that one of Fisher's bargaining chips in the negotiations was the FDP inventory which was specific to the patents purchased by Globe so Fisher needed to find a way to get the FDP inventory to Globe.

Since Fisher could not personally purchase the inventory, he and Brennan formulated a plan for Brennan to purchase the inventory from FDP and then sell it on an "as needed" basis to Globe. Brennan initially offered to purchase the inventory from NCB, who held a security interest in it. NCB responded that any offer should be made to Fisher. Thus, Brennan purchased the FDP inventory from Fisher for $3,850 and began selling it on an "as needed" basis to Globe. Through October 2004, Globe had paid a total of $99,128.65 to Brennan for parts.

The Bankruptcy Court first determined that FDP was legally Fisher's alter ego. It then determined that the transfer of inventory from FDP to Brennan was actually a transfer from Fisher to Brennan and that the inventory was the property of the Estate. From this, the Bankruptcy Court reasoned that any proceeds that Brennan received from the sale of the FDP inventory are also recoverable property of the estate.

The Bankruptcy Court concluded that the transfer of FDP inventory was made with "the actual intent to hinder, delay, or defraud" Fisher's creditors and was, therefore, fraudulent under 11 U.S.C. § 548. The Trustee was awarded damages in the amount of $99,128.65 as the proceeds of the sale of the fraudulently transferred inventory and Brennan was ordered to provide an accounting of the inventory and turn over any remaining inventory to the Trustee.

**B. The Appeals**

The Defendants raise four issues on appeal. They first argue that the Bankruptcy Court erred by granting a reverse piercing of the corporate veil. Their second argument is that there was insufficient evidence for piercing the corporate veil. Their third argument is that the Trustee lacks standing to set aside the sale of the FDP inventory. Their final argument is that the Trustee failed to prove each element of an "actual fraud" claim against the Defendants. The Trustee raises one issue on cross appeal: the Bankruptcy Court erred in concluding that the "large number of fund transfers" were not fraudulent transfers. The standard of review will next be set forth followed by an analysis of each of the issues raised by the Parties.

**IV. STANDARD OF REVIEW**

The appeals in this case may result in one or a combination of several outcomes. "On an appeal, the district court ... may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings." *In re Caldwell,* 851 F.2d 852, 857 (6th Cir.1988) (quoting B.R. 8013), *aff'd,* 895 F.2d 1123 (1990).

A district court reviews a bankruptcy court's findings of fact, whether based upon oral or documentary evidence, for clear error. *In re Baker & Getty Financial Services, Inc.*, 106 F.3d 1255, 1259 (6th Cir.1997), *cert. denied*, 522 U.S. 816, 118 S.Ct. 65, 139 L.Ed.2d 27 (1997). A factual finding is clearly erroneous when, although there is evidence to support it, "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Ayen*, 997 F.2d 1150, 1152 (6th Cir.1993)(quoting *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)). A factual finding is not to be disturbed unless there is "most cogent evidence of mistake or miscarriage of justice." *Caldwell*, 851 F.2d at 857 (citing *Slodov v. United States*, 552 F.2d 159, 162 (6th Cir.1977), *rev'd on other grounds*, 436 U.S. 238, 98 S.Ct. 1778, 56 L.Ed.2d 251 (1978)). Further, due regard is to be given to the opportunity of the bankruptcy court to judge the credibility of witnesses. *Id.* Finally, "[i]f the bankruptcy court's factual findings are silent or ambiguous as to an outcome determinative factual question, the district court ... must remand the case ... for necessary factual determinations." *Id.*

A district court reviews a bankruptcy court's conclusions of law de novo. *Baker & Getty*, 106 F.3d at 1259. De novo review requires the district court to review questions of law independent of the bankruptcy court's determination. *In re Eubanks*, 219 B.R. 468, 469 (6th Cir. BAP 1998). Finally, if the bankruptcy court's conclusion raises a mixed question of law and fact, the district court breaks the question into its constituent parts and ap-

plies the appropriate standard of review for each. *In re Batie*, 995 F.2d 85, 88 (6th Cir.1993). Having set forth the standard of review, the analysis turns to the issues raised by the Parties.

## V. PIERCING OF THE CORPORATE VEIL

The Bankruptcy Court determined that Fisher, the debtor, treated FDP, the company formed by Fisher, as his alter ego. As a result, the transfer of FDP's inventory to Brennan was a transfer from Fisher to Brennan. The Defendants now argue that the Bankruptcy Court erred when it decided this issue because the decision was based upon a reverse piercing of the corporate veil which is not recognized in Ohio. This is a question of law and is thus reviewed de novo.

Ohio law provides that the corporate veil can be pierced and individual shareholders held liable for corporate misdeeds [1] "when it would be unjust to allow the shareholder to hide behind the fiction of the corporate entity." *Belvedere Condominium Unit Owners' Association v. R.E. Roark Companies, Inc.*, 67 Ohio St.3d 274, 617 N.E.2d 1075, 1085 (1993). Individual shareholder liability is allowed only if the shareholder is "indistinguishable from or the 'alter ego' of the corporation itself." *Id.* Finally, the corporate form may be disregarded and individual shareholders held liable for corporate misdeeds when certain factors are satisfied. *Id.* at 1086.

The Bankruptcy Court did not base its decision upon a reverse piercing of the corporate veil. A reverse piercing of the corporate veil occurs when the corporate veil is pierced by a shareholder or

---

1. The Defendants misstate this doctrine when they argue that it permits an individual to be held liable for the debts of a corporation. It goes much further and permits an individual to be held liable for not only debts, but for the misdeeds of a corporation.

corporate officer to redress wrongs allegedly done to the corporate entity. *Geiger v. King,* 158 Ohio App.3d 288, 815 N.E.2d 683, 685 (2004), *appeal not allowed,* 103 Ohio St.3d 1409, 812 N.E.2d 1290 (2004). In this case, the wrong, the fraudulent transfer of the inventory to Brennan, was not done *to* the corporate entity, it was done *by* the corporate entity.

The Bankruptcy Court correctly applied Ohio law and determined that Fisher was the only shareholder and FDP was his alter ego. The Bankruptcy Court then found that Fisher was liable for the misdeed of FDP when FDP fraudulently transferred its inventory to Brennan.

The Defendants also argue that the Trustee is in the shoes of Fisher, the debtor and the shareholder of FDP, and thus cannot reverse pierce FDP's corporate veil to redress wrongs allegedly done to the corporate entity. Said another way, the Defendants argue that the doctrine is to be used *against* a shareholder who uses the corporation as his or her alter ego and not *by* such an individual.

 Inherent in this argument is the Defendant's belief that the Trustee can assert only those property rights held by the debtor. However, the Trustee's ability to assert the alter ego doctrine is not dependent only upon Fisher's right to assert it. The Trustee is empowered to assert the rights of certain unsecured fictional creditors. 11 U.S.C. § 544; *see also Taylor Steel, Inc. v. Keeton,* 417 F.3d 598, 605–06 (6th Cir.2005) (third party creditor may pierce the corporate veil); *Lemaster v. United States,* 891 F.2d 115, 119 (6th Cir.1989) (permitting the federal government to proceed against the alter ego of a taxpayer for the taxpayer's obligations). Specifically, the Trustee is empowered to avoid any transfers of interest in property that are voidable by a creditor holding an allowable unsecured claim. Since the

Trustee can assert property rights held by others, she can pierce FDP's corporate veil and assert property rights against Fisher.

The Ohio Supreme Court adopted corporate veil piercing to protect creditors from shareholders who use the corporate entity for criminal or fraudulent purposes. In this case, it was correctly applied to protect creditors from the fraudulent use of FDP by Fisher.

The Defendants unsuccessfully attempt to reverse the roles of those involved. However, the corporate misdeed in this case was not done by FDP, it was done by Fisher using FDP as his alter ego. Here, it would be unjust to allow Fisher to hide behind FDP's corporate veil.

## VI. MORE ABOUT PIERCING OF THE CORPORATE VEIL

The Defendants next argue that, assuming that FDP's corporate veil could be pierced, there was insufficient evidence that it was. The Trustee responds that there was sufficient evidence. This is a question of fact and is thus reviewed for clear error.

### A. The Elements

 The Ohio Supreme Court has set forth the three elements that must be shown to pierce the corporate veil:

(1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own,

(2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and

(3) injury or unjust loss resulted to the plaintiff from such control and wrong.

*Belvedere,* 617 N.E.2d at 1086.

 The Defendants argue that there is no evidence to support any of these

elements. However, the Bankruptcy Court found that there was.

First, based upon the evidence presented, the Bankruptcy Court concluded that FDP was Fisher's alter ego and thus had no mind of its own. This satisfies the first element necessary to pierce the corporate veil and the Defendants have identified no evidence to the contrary.

Second, based upon the evidence presented, the Bankruptcy Court concluded that the transfer of FDP's inventory to Brennan was actually a transfer from Fisher to Brennan because FDP was Fisher's alter ego. The Bankruptcy Court also correctly concluded that the inventory was property of the estate and that its transfer to Brennan was fraudulent because it was made to hinder, delay or defraud Fisher's creditors. Specifically, "Fisher intentionally created a plan to keep the value of the inventory for himself by having Brennan purchase it." This satisfies the second element necessary to pierce the corporate veil and the Defendants have identified no evidence to the contrary.

Third, based upon the evidence presented, the Bankruptcy Court concluded that "Fisher and Brennan, with the knowledge that Fisher was going to file bankruptcy, operated in concert to receive the benefit of the FDP inventory and, in doing so, fraudulently removed property from the reach of the Trustee in this bankruptcy." Thus, the Bankruptcy Court determined that the Trustee, as a representative of Fisher's estate, was harmed by the fraudulent transfer of FDP's inventory by Fisher. This satisfies the third and final element necessary to pierce the corporate veil.

## B. The Defendants' Arguments

The Defendants argue that the purportedly fraudulent transaction is the transaction that occurred between FDP, Brennan and NCB, and that it is "undisputed" that this transaction occurred as a result of NCB's appraisal of the inventory. However, there is evidence that the fraudulent transaction occurred between Fisher and Brennan. Although NCB's appraisal may have been used to set the price, NCB specifically declined to be a part of the transaction.

The Defendants also argue that "there is absolutely no evidence that any 'control' of Fisher over FDP 'caused' this transaction." In particular, according to the Defendants, FDP had ceased to operate and Fisher had little or no control over FDP at the time of the transaction.

However, there is a significant amount of evidence to the contrary, evidence that was presented at trial and believed credible by the Bankruptcy Court. The Bankruptcy Court found that "Fisher undertook careful pre-bankruptcy planning," and that part of that planning was the "removal of the inventory out of FDP and into Brennan's hands." Also, Brennan addressed the offer to purchase the inventory to Fisher. Therefore, based upon the evidence presented at trial, the Bankruptcy Court determined that Fisher had the necessary control over FDP to sell the inventory to Brennan.

The Bankruptcy Court had the opportunity to judge the credibility of the witnesses and evidence presented. Based upon this evidence, the Bankruptcy Court determined that the elements necessary to pierce FDP's corporate veil were proved by the Trustee. In doing so, there is no evidence of a mistake and the Bankruptcy Court has not made a clear error.

## VII. TRUSTEE'S STANDING

The Defendants next argues that the Trustee lacks standing to set aside the transaction between FDP, Brennan and

NCB because the Trustee did not have any financial interest in the outcome of the adversarial proceeding. The Trustee responds that the Defendants have waived this issue because it was not raised before the trial court. The Trustee also responds that she only sought to avoid the transfer between FDP, Fisher's alter ego, and Brennan and that she had standing to set aside this transfer.

The Trustee did not attempt to set aside a transfer between FDP as Fisher's alter ego and NCB or between Brennan and NCB. On this, both Parties agree. Further, the Bankruptcy Court only addressed the transfer between FDP, as Fisher's alter ego, and Brennan. Therefore, only standing to set aside the transfer between FDP, as Fisher's alter ego, and Brennan will be addressed. The Trustee also addresses her standing to gain the proceeds from Brennan's sale of the inventory to Globe. However, this standing was not challenged by the Defendants and is not addressed herein.

### A. Standing

Generally, issues raised for the first time on appeal are not considered by an appeals court. *In re Morris*, 260 F.3d 654, 663 (6th Cir.2001). However, there are exceptions to this general rule. *Id.* at 664. One such exception involves a question of standing.

Appeals courts have regularly reviewed standing, even if it has not been raised below, because standing is jurisdictional in nature and implicates the appeals court's power to adjudicate the issue. *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450, (1977) (standing first addressed at the Supreme Court level); *In re Cannon*, 277 F.3d 838, 848 (6th Cir.2002) (appeals court first considered standing of Trustee to avoid a transfer

when adjudicating an appeal); *Ohio Association of Independent Schools v. Goff*, 92 F.3d 419, (6th Cir.1996) (standing first addressed following a five-day bench trial), *cert. denied*, 520 U.S. 1104, 117 S.Ct. 1107, 137 L.Ed.2d 309 (1997); *In re Bli Farms*, 312 B.R. 606, 617 (E.D.Mich.2004).

Whether a plaintiff has standing is a legal question which is reviewed de novo. *Goff*, 92 F.3d at 421 (citing *Greater Cincinnati Coalition for the Homeless v. City of Cincinnati*, 56 F.3d 710, 715 (6th Cir.1995)). When reviewing a legal question de novo, the district court makes a determination independent of the bankruptcy court's finding. Finally, the plaintiff bears the burden of demonstrating standing. *Coal Operators and Associates, Inc. v. Babbitt*, 291 F.3d 912, 916 (6th Cir.2002).

Therefore, the Trustee's standing will be reviewed de novo. Further, the Trustee has the burden of proof that she has standing.

### B. The Trustee's Arguments

The Trustee argues that 11 U.S.C. § 548(a)(1)(A) grants her standing to avoid the transfer from FDP to Brennan. The relevant portion of section 548(a)(1)(A) provides that a trustee may avoid any transfer of an interest of a debtor in property if the debtor voluntarily made such a transfer with actual intent to hinder, delay or defraud any entity to which the debtor was or became indebted to. 11 U.S.C.A. § 548(a)(1)(A). Section 550(a) then permits an avoided transfer to be recovered for the benefit of the estate. 11 U.S.C. § 550(a).

The Trustee also argues that, even if the entire value of the amount avoided would go to a secured creditor, this amount would free up other funds to go to unsecured creditors and she would thus have

standing on behalf of the unsecured creditors. *See In re Triple S Restaurants, Inc.,* 422 F.3d 405, 412 (6th Cir.2005), *cert. denied,* —— U.S. ——, 126 S.Ct. 1143, 163 L.Ed.2d 1000 (2006). In other words, decreases in the amount of secured debt increase the Trustee's ability to pay the remaining creditors. There are no facts in the record on appeal that would allow this Court to dispute this argument.

The Trustee also argues that 11 U.S.C. § 548(a)(1)(B) grants her standing to avoid the transfer from FDP to Brennan. On this she is correct. The relevant portion of section 548(a)(1)(B) provides that a trustee may avoid any transfer of an interest of a debtor in property if the debtor received less than a reasonably equivalent value in exchange for such transfer. 11 U.S.C.A. § 548(a)(1)(B). Section 550(a) then permits an avoided transfer to be recovered for the benefit of the estate. 11 U.S.C. § 550(a).

Finally, the Trustee argues that she had standing to avoid the transfer from Fisher to Brennan "under Ohio law as a result of one of the statuses she acquired under Code § 544." However, the Trustee does not specifically identify which of the statuses to which she is referring nor does she identify the Ohio law to which she is referring. Therefore, this argument cannot be considered herein.

## C. The Defendants' Argument

The Defendants argue that the Trustee had no financial interest in the sale of FDP's inventory and thus no standing to pursue an adversary proceeding. The basis for this argument is that, according to the Defendants, NCB was a secured creditor and was entitled to the proceeds of the sale of the inventory and the Trustee was entitled to none. Therefore, recovery of the transfer was not for the benefit of the estate.

In support of their argument, the Defendants indicate that NCB was owed $846,251.78 as of the date of Fisher's bankruptcy filing. However, the source of this evidence is not a part of the record on appeal nor have the Defendants requested that it be a part of the record on appeal.

The Defendants also argue that the total appraised value of FDP's assets was $45,560. Again, this evidence is not a part of the record on appeal nor have the Defendants requested that it be a part of the record on appeal. Further, the actual recoverable value of the inventory is not known because, as of the date of the Opinion, not all of the inventory had been disposed of by Brennan.

Therefore, while there is testimony in the record on appeal that NCB was a secured creditor, there is no evidence in the record on appeal as to the amount owed NCB as a secured creditor. There is also no evidence as to the total amount recoverable to the estate. Therefore, there are no facts in the record on appeal from which this Court can conclude that the recovery of the transfer of the inventory to Brennan was not for the benefit of the estate.

The lack of evidence is perhaps because the Defendants did not raise the issue of standing until this appeal and the evidence could not have been developed at the trial court level. There is no mention of standing to avoid the transfer of inventory in the trial transcript, in Brennan's Post-trial Brief or in Brennan's Post–Trial Reply Brief. Therefore, while a court is obligated to address standing at any point, an appeals court can only do so on the facts available to it.

Assuming arguendo that NCB was a secured creditor for an amount greater than the value of the inventory transferred to Brennan, the Defendants cite *Melamed*

*v. Lake County National Bank,* 727 F.2d 1399 (6th Cir.1984), for the proposition that, since the proceeds of the inventory all went to NCB, the other creditors of Fisher were not harmed by the transfer and the Trustee had no standing to avoid the transfer of the inventory. In *Melamed,* a panel of the Sixth Circuit held that a payment which would never have been made to the debtor without the intervention of the secured creditor and was subject to the secured creditor's security interest did not hinder, delay or defraud other creditors. 727 F.2d at 1402. In this case, there is no evidence that the payment would not have been made to Fisher without interference from NCB. In fact, there is evidence that Brennan's payment to FDP, Fisher's alter ego, was made without interference from NCB. NCB insisted that the inventory be purchased from FDP.

The *Melamed* case is also not relevant here because *Melamed* does not address standing, which is the issue here. The *Melamed* court was addressing the validity of a claim that was presented to a jury. In fact, neither the parities involved nor the courts in *Melamed* challenged the trustee's standing to bring the claim.

*Melamed* is also factually distinguishable from the issues presented here. *Melamed* involves an attempt to avoid a transfer by a debtor to a bank that was also a creditor. Here, the transfer at issue is from a debtor to a third party.

In yet another effort to raise the same basic argument, the Defendants assert that FDP had legal title to the parts but no equitable title since the inventory was fully encumbered by NCB. From this they argue that FDP had nothing to sell to Brennan. However, this argument fails for the same reasons that the Defendants' other argument on this issue failed, the Defendants have not submitted evidence

that shows that Brennan did not have any equitable interest in the inventory.

Finally, the Defendants identify two cases in their Reply Brief that they assert support their argument, based upon *Melamed,* that the Trustee was entitled to none of the proceeds of the sale. The two cases identified are *In the Matter of Ramba, Inc.,* 437 F.3d 457 (5th Cir.2006), and *Wellman v. Wellman,* 933 F.2d 215 (4th Cir.1991), *cert. denied,* 502 U.S. 925, 112 S.Ct. 339, 116 L.Ed.2d 279 (1991). While these two cases were identified for the first time in a reply brief and should not be considered here, they will be because they do not support the Defendants' arguments.

Both of these cases are factually distinguishable from this case or unclear as regard to the issue of standing. Therefore, any legal implication that they may provide for this case is irrelevant. Standing is a fact sensitive issue that is addressed on a case by case basis and the facts that are available in the record on appeal indicate that the Trustee had standing to avoid the transfer of inventory from FDP, as Fisher's alter ego, to Brennan.

The "standing" arguments and analysis regarding the application of section 548(a)(1)(B) are the same as those regarding section 548(a)(1)(A). Therefore, the results are the same. Based upon the record on appeal, the Trustee had standing to avoid the transfer of inventory from FDP, as Fisher's alter ego, to Brennan.

## VIII. FRAUD

The Defendants' final argument on appeal is that the Bankruptcy Court erred in granting judgment in favor of the Trustee based upon the "actual fraud" of the Defendants because the Trustee failed to prove the elements of a fraud claim against the Defendants. The Trustee re-

sponds that there was sufficient evidence from which the Bankruptcy Court could conclude that the Defendants committed "actual fraud."

The Bankruptcy Court determined that the inventory transfer from Fisher to Brennan was fraudulent pursuant to 11 U.S.C. § 548(a)(1)(A) because the transfer was made with actual intent to hinder, delay or defraud Fisher's creditors. A finding of actual fraudulent intent under section 548(a)(1)(A) is a factual finding and is reversed only upon a showing of clear error. *Zenter GBV Fund IV v. Vesper*, 19 Fed.Appx. 238, 243 (6th Cir.2001) (citing *In re Sherman*, 67 F.3d 1348, 1353 (8th Cir.1995)). Also, "[b]ecause proof of actual intent to hinder, delay or defraud creditors may rarely be established by direct evidence, courts infer fraudulent intent from the circumstances surrounding the transfer." *Id.* (quoting *In re Mark Benskin & Co., Inc.*, 59 F.3d 170, 1995 WL 381741 at *5 (6th Cir.1995), *cert. denied*, 516 U.S. 1072, 116 S.Ct. 774, 133 L.Ed.2d 726 (1996)).

## A. The Elements of Actual Fraud

■ To succeed under section 548(a)(1)(A), the trustee must show: (1) that there was a transfer of an interest of the debtor in property; (2) that the transfer occurred within one year prior to the date of the filing of the bankruptcy petition; and (3) that the transfer was made with the actual intent to hinder, defraud or delay. *In re Baker & Getty Financial Services, Inc.*, 98 B.R. 300, 308 (Bankr. N.D.Ohio 1989), *aff'd*, 974 F.2d 712 (6th Cir.1992). In this case, the Parties do not dispute and the record on appeal shows that the first two requirements have been satisfied. The Defendants' argument turns, then, on whether Fisher transferred the inventory to Brennan with the actual

intent to hinder, delay or defraud Fisher's creditors.

## B. The Bankruptcy Court's Factual Determinations

■ In this case, the Bankruptcy Court found that the transfer was made with intent to hinder, delay or defraud based upon the circumstances surrounding the transfer. The Bankruptcy Court determined that Fisher was an "adept business person who was both capable and willing to reap every possible benefit from FDP prior to its demise." To this end, the Court found "abundant evidence" that Fisher undertook careful bankruptcy planning that included the removal of the inventory into Brennan's hands. Part of the evidence identified by the Bankruptcy Court were the Globe memoranda which made it clear that Fisher was working on a deal to get the inventory to Globe at a reduced price and without requiring Globe to purchase the inventory directly. The Bankruptcy Court also found it "compelling" that Fisher knew the inventory had a much greater value that NCB placed on it and that he knew the inventory was a "money-making" opportunity. Finally, the Bankruptcy Court found it "simply too convenient" that Brennan, the person that Fisher was living with, eventually purchased the inventory. All of the facts found by the Bankruptcy Court indicated to it that Fisher and Brennan "not only devised, but executed, an effective plan to move the inventory from FDP for their benefit without having to sacrifice any of the inventory's value in Fisher's bankruptcy."

The Bankruptcy Court's determination is best summarized by its statement that, "[t]his transfer reeks of actual fraud." Based upon the evidence before it, the Bankruptcy Court concluded that, "Fisher and Brennan, with the knowledge that

Fisher was going to file bankruptcy, operated in concert to receive the benefit of the FDP inventory and, in doing so, fraudulently removed property from the reach of the Trustee in this bankruptcy."

## C. The Defendants' Arguments

The Defendants offer several arguments as to why the transfer of inventory from Fisher to Brennan was not fraudulent. Each will be addressed seriatim.

 First, the Defendants make the general statement that the Opinion is "largely based upon speculation and surmise...." While "speculation and surmise" may not be the proper terms, the trail court has the responsibility to make factual determinations based upon the evidence presented and the demeanor of the witnesses. Also, there is seldom direct evidence of fraud and courts are to infer fraudulent intent from the circumstances surrounding the transfer. That is precisely what the Bankruptcy Court did.

Next, the Defendants argue that, "[f]rom the foregoing statement, and from a review of Exhibit 6(c), it is impossible to understand that the Court believes that negotiations between Fisher and Globe for the purchase of the inventory leads to the conclusion that the ultimate purchase by Brennan was fraudulent." However, there are at least three flaws in this argument.

First, Exhibit 6(c) is not a part of the record on appeal. Second, the fraudulent transfer was between Fisher and Brennan and not between Fisher and Globe. Third, the Bankruptcy Court, as it must, relied upon written evidence in addition to the testimony by Patrick Winton that is identified by the Defendants.

Next, the Defendants argue that the Bankruptcy Court "completely mischaracterized" Fisher's testimony regarding what he knew to be the value of the inventory.

The Bankruptcy Court found that Fisher knew the inventory was a money-making opportunity and had a much greater value than NCB had placed on it, a value that was between $200,000 and $300,000.

At trial, Fisher testified that the inventory was "priced" at the value of the inventory on the books and the value on FDP's books was $200,000 or maybe close to $300,000. From this, the Bankruptcy Court could reasonably conclude that Fisher knew the inventory had a value between $200,000 and $300,000.

The Defendants next argue that Fisher's disclosure to NCB that the inventory would be more valuable to Globe "negates any finding of fraud." The trial testimony reveals that NCB knew that the inventory would be more valuable to someone who owned the patents and that Fisher sold his patents to Globe. There are at least two flaws in this argument.

First, the fraud was perpetrated on Fisher's creditors, of which Globe was one but there were others, so revealing this information to Globe does not negate a fraud being perpetrated on other creditors. Second, to be able to work the fraud, Fisher and Brennan needed a buyer, they needed to be sure that NCB did not take the inventory and sell it to someone else, and they needed to be sure that NCB did not oppose the sale. Telling NCB that the inventory would be more valuable to Globe satisfied all three of these needs. Instead of negating the fraud, the Bankruptcy Court, based upon the evidence, could reasonably have concluded that telling NCB about the value of the inventory to Globe was necessary to perpetrate the fraud.

Next, the Defendants argue that the Bankruptcy Court incorrectly assessed Brennan's credibility regarding her knowledge of Fisher's financial status. However, the Bankruptcy Court's assessment of Brennan's credibility was based upon

much more. In its Order, the Bankruptcy Court used Brennan's testimony regarding her knowledge of Fisher's financial status only as an example. The Bankruptcy Court determined that, "[n]ot only did both Defendants provide testimony that conflicted with their own earlier depositions, they also provided testimony at the trial in which they conflicted with each other." Finally, the Bankruptcy Court had the opportunity to observe Fisher and Brennan's demeanor and conduct on the witness stand.

The Defendants next argue that, since NCB was the only creditor at issue in this case and was a willing participant, there could be no fraud. However, there are at least three flaws in this argument.

First, NCB knew about the value of the inventory to Globe, but NCB was not found to be a participant in the fraud. Second, there is no evidence in the record on appeal that NCB was the only creditor and thus others may have been defrauded. Third, fraudulent schemes many times include willing participants having the same role as NCB did in this case.

The Defendants next argue that there is no evidence that the transaction between Fisher and Brennan was concealed. This argument has at least two flaws. First, it incorrectly assumes that NCB is the only creditor with resources at issue. Second, there is no requirement that fraudulent schemes be concealed. In fact, this one apparently was discovered by the Trustee.

The Defendants next argue that there is no evidence to support the theory that Fisher arranged for Brennan to purchase the inventory. In support, they refer to both Brennan and Fisher's testimony that Fisher did not want Brennan to purchase the inventory and that it was Brennan's decision to do so. However, there are at least three flaws in this argument.

First, the Bankruptcy Court found that it was obligated to make findings of fact regarding two defendants who where intimately familiar with each other and had ample time to rethink their motivations for acting in the manner that they did. Second, the Bankruptcy Court found Fisher and Brennan's testimony "completely lacking in credibility" and relied heavily upon the written evidence presented at trial. Third, based upon the evidence presented, the Bankruptcy Court found that both Brennan and Fisher's testimony regarding the transfer of inventory was "unbelievable," and that, "Fisher intentionally created a plan to keep the value of the inventory for himself by having Brennan purchase it." Thus, based upon the evidence presented and the opportunity to observe the demeanor and conduct of the witnesses, the Bankruptcy Court made a determination regarding their intent.

Finally, the Defendants argue that the fact that Globe almost immediately needed some of the inventory is not evidence of "wrong doing among these parties, it is simply evidence that Globe needed some of the inventory." While the Bankruptcy Court did find that Globe needed some of the inventory, it also made factual findings regarding Fisher and Brennan's intent and many other issues. Alone, Globe's need may not be evidence of wrong doing. But, in the context of this case, including Fisher's employment negotiations with Globe and Globe's subsequent purchase of FDP's patents, Globe's need is relevant to creating a situation where Fisher could perpetrate fraud.

The Parties present argument regarding constructive fraud and other legal theories. However, those arguments need not be addressed herein. The Bankruptcy Court determined that the inventory was transferred from FDP, Fisher's alter ego, to Brennan with actual intent to hinder, delay

or defraud Fisher's creditors. Since proof of actual intent to hinder, delay or defraud creditors may rarely be established by direct evidence, the Bankruptcy Court inferred fraudulent intent from the circumstances surrounding the transfer. The Bankruptcy Court make this determination based upon the evidence and the conduct and demeanor of the witnesses. Giving due regard to the opportunity of the Bankruptcy Court to judge the credibility of witnesses, there is no cogent evidence of mistake or miscarriage of justice and thus, no clear error.

## IX. MULTIPLE TRANSFERS FROM FISHER TO BRENNAN

The Trustee argues that the Bankruptcy Court erred in concluding that Fisher's multiple deposits of his funds in Brennan's bank account after November 1, 2002 were not fraudulent transfers. The Defendants respond that Fisher's multiple transfers to Brennan were not fraudulent transfers.

### A. The Relevant Time Periods

At the outset, the Trustee's argument is not well founded because the Bankruptcy Court did not conclude that Fisher's deposits after November 1, 2002, were not fraudulent. Fisher filed for bankruptcy on April 16, 2003. The Bankruptcy Court separated the multiple transfers into two time periods, one time period included the transfers that occurred in the time before one year prior to Fisher's bankruptcy filing and one time period included the transfers that occurred within one year of Fisher's bankruptcy filing. The Bankruptcy Court then determined that transfers in the time period before one year prior to Fisher's bankruptcy filing resulted in no net transfer between Fisher and Brennan. The Bankruptcy Court also determined that, during the one-year time period before the bankruptcy filing, Brennan trans-

ferred more to Fisher than Fisher transferred to Brennan. The Bankruptcy Court concluded that all of these transfers were "simply transfers made between two people living together and working to pay the living expenses of the household," and, therefore, the evidence is insufficient to show the elements of a preference or fraudulent transfer pursuant to the Bankruptcy Code or Ohio state law. Further, the Bankruptcy Court indicates that, "[t]he Trustee conveniently and inexplicably forgets that his own Exhibits show that Brennan ... transferred more to the Debtor [Fisher] than she received over the period of time in question."

The Trustee offers no explanation in her pre-trail Brief, in her opening statement, in her post-trial Brief or now as to why she argues that the relevant time period is between November 1, 2002, and Fisher's bankruptcy filing. The Bankruptcy Court found that, "[a]s with most of the Trustee's pleadings regarding this large group of transfers, the court finds the Trustee's assertions unclear." To this, this Court would agree. Since the Trustee is now appealing a decision that was not made, the Trustee's arguments are not well-founded. Further, the Trustee has presented no evidence that the factual determinations of the Bankruptcy Court are in error and this Court finds no error in those determinations.

### B. Issues of Law

In addition to appealing a decision that was not made, the Trustee has also argued certain issues of law that are not well founded. Each will be addressed seriatim.

First, the Trustee cites *In re Chomakos,* 69 F.3d 769, 771 (6th Cir.1995), *cert. denied,* 517 U.S. 1168, 116 S.Ct. 1568, 134 L.Ed.2d 667 (1996), for the proposition that it was error to net the multiple transfers. In *Chomakos,* the court considered

whether reasonably equivalent value was received for each individual gambling wager. The *Chomakos* court also indicated that "the critical time is when the transfer is made." *Id.* However, this statement refers to a determination of whether there has been appreciation or depreciation in value and appreciation or depreciation is not an issue in this case.

 When considering transfers, the "court must keep the equitable purposes of the statute firmly in mind, recognizing that any significant disparity between the value received and the obligation assumed ... will have significantly harmed ... innocent creditors." *In re Guerrera*, 225 B.R. 32, 36 (Bankr.D.Conn. 1998) (citing *Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d 979, 994 (2d Cir.1981)). Also, "[i]t is not necessary that there be 'mathematical precision' or a 'penny-for-penny' exchange in order to establish reasonably equivalent value." *Id.*

 Other courts have "netted" transfers or considered them together when it is appropriate to do so. See *In re Fordu*, 201 F.3d 693 (6th Cir.1999) (considered whether reasonably equivalent value was received for a combination of several items of property transferred in a divorce decree including a marital residence, alimony and interest in a restaurant); *Scholes v. Lehmann*, 56 F.3d 750, (7th Cir.1995) (considered whether reasonably equivalent value was received for several payments to a previous spouse and several payments to a charity), *cert. denied*, 516 U.S. 1028, 116 S.Ct. 673, 133 L.Ed.2d 522 (1995). This is one of those times when it is appropriate to net transfers and the netting is not forbidden by the law.

The Trustee next argues that an unperformed promise to provide support is not value and, therefore, Fisher received no value for each deposit he made into Bren-

nan's account. However, the Bankruptcy Court found that Fisher received value for the deposits that he made into Brennan's account. The Bankruptcy Court found that Fisher and Brennan "shared financial responsibilities for the household, each paying a portion of their expenses including the monthly mortgage, utilities, and general living expenses" as well as the expense of raising children. The Bankruptcy Court found that these transfers "are no more than daily maintenance of a household ..." There were no unperformed promises in this case.

The Trustee next argues that transfers to provide for household expenses can be fraudulent. However, the cases cited by the Trustee in support discuss the reasonably equivalent value of "the care and comfort one receives from a marital relationship", *In re Kelsey*, 270 B.R. 776, 781 (10th Cir. BAP 2001), and a situation where the defendant "was a mere conduit of the funds" transferred and the parties did not dispute that there had been a fraudulent transfer, *In re Hurtado*, 342 F.3d 528 (6th Cir.2003).

In this case, the Bankruptcy Court found that Fisher received reasonably equivalent value in the form of the daily maintenance of a household in which he lived. Other courts have found that the transferor did not commit fraudulent transfers when funds were used to pay for ordinary household expenses. See *In re Ratner*, 132 B.R. 728, 733 (N.D.Ill.1991); *In re DiFabio*, 2004 WL 5250438 at *, 2004 Bankr LEXIS 1952 at * (Bankr D.Conn. Nov. 22, 2004)

The Trustee next argues that the Bankruptcy Court confused the elements of "constructive" fraud with the elements of "intentional" fraud. However, this argument is also not well founded.

With regard to actual fraud, the Bankruptcy Court specifically concluded that the Defendant's testimony regarding the multiple transfers "was not indicative of preferential or fraudulent intent." With regard to constructive fraud, the Bankruptcy Court specifically found that, "[t]he Trustee's arguments regarding constructive fraud and the many badges of fraud that are present in the Defendants' relationship are to no avail if the Trustee cannot produce any intelligible evidence showing that Fisher transferred more money to Brennan than he received."

The Bankruptcy Court addressed both actual fraud and constructive fraud. Further, while the Trustee cites the law regarding the elements of actual fraud and constructive fraud, she has not shown that the Bankruptcy Court misapplied this law.

 The Trustee next argues that, despite finding many badges of fraud, the Bankruptcy Court failed to shift the burden of proof to Fisher to establish the absence of fraudulent intent. In support the Trustee argues that badges of fraud *can* raise presumptions of actual intent. The burden is then shifted to the debtor to establish the absence of fraudulent intent. *See Matter of Loeber,* 12 B.R. 669 (Bankr. D.N.J.1981). However, in this case, and even if this is a correct statement of the law, the Bankruptcy Court specifically found that there was no fraudulent intent. Therefore, there was no reason to shift the burden to the debtor.

The Trustee finally argues that the trial court should have shifted the burden of proof to Brennan to show that she took the transfers for value and in good faith. In support, the Trustee cites section 548(c) and Ohio Rev.Code § 1336.08(A) for the proposition that the recipient of a fraudulent transfer may still avoid liability if the recipient proves that value was given in good faith. However, in this case, and even if this is a correct statement of the law, the Bankruptcy Court did not find fraudulent intent. Therefore, there was no reason to shift the burden to Brennan to show that she took the transfers for value and in good faith.

## X. CONCLUSION

The Bankruptcy Court correctly applied the law to determine that Fisher, the debtor, treated FDP, the company formed by Fisher, as his alter ego, and there is no clear error in the Bankruptcy Court's factual determination that FDP was Fisher's alter ego. Further, the Trustee had standing to set aside the transfer of the inventory from Fisher to Brennan. Finally, the Bankruptcy Court committed no clear error in its factual determination that Fisher fraudulently transferred the inventory to Brennan. Therefore, the Bankruptcy Court's decision that the inventory sale from FDP, as Fisher's alter ego, to Brennan was fraudulent under 11 U.S.C. § 548 is AFFIRMED.

Further, the Bankruptcy Court correctly applied the law and made no clear errors in its factual determinations that the multiple transfers from Fisher to Brennan made between December 2000 and April 2003 were not fraudulent. This decision is also AFFIRMED. The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.