In re Michelle V. SIMIONE, Debtor.

Michelle V. Simione, Movant,

v.

Nationsbank of Delaware, N.A., Corestates Bank of Delaware, N.A., First Card FCC National Bank, Portfolio Recovery Associates, Associates National Bank of Delaware, First Bankcard Center, Maxflow Corp. on Behalf of MBNA America Bank N.A., TAPR VIII LP Successor to GE Capital, CF SPC NGU, Inc. Successor to Fleet, CF SPC NGU, Inc. Successor to Household, TAPR VIII LP Successor to Chase, Respondents.

Gary J. Gaertner, Trustee, Plaintiff,

v.

Angela Caron and Paul Caron, Defendants.

Bankruptcy No. 98–10121.
Adversary No. 98–1076.

United States Bankruptcy Court, W.D. Pennsylvania.

Jan. 26, 1999.

Lawrence C. Bolla, Erie, PA, for Michelle V. Simione.

Gary J. Gaertner, Pittsburgh, PA, Chapter 13 Trustee, pro se.

D. Alexander Barnes, Malvern, PA, for Max Recovery, Inc., Successor in Interest to Corestates Bank, N.A. and FCC National Bank; Max Flow Corp., on Behalf of MBNA Bank America, N.A., and Associates National Bank.

John R. Wingerter, Erie, PA, for Angela Caron and Paul Caron.

## DEBTOR'S OBJECTION TO ALLOWANCE OF CLAIMS

WARREN W. BENTZ, Bankruptcy Judge.

### *OPINION*

#### *Factual Background*

There are no material factual disputes. By document entitled POWER OF ATTORNEY executed on July 28, 1992 (the "Power of Attorney"), Michelle V. Simione ("Simione" or "Debtor") appointed her cousin, Angela Caron ("Mrs. Caron") as attorney-in-fact "to act for [Simione] and on [Simione's] behalf, and in [Simione's] name and stead, to transact all of [Simione's] business and to manage all of [Simione's] property and affairs as [Simione] might do if personally present...." The Power of Attorney provides that it is a "durable Power of Attorney and shall not be affected in any manner by ... future disability or incapacity...."

After execution of the Power of Attorney, between 1992 and 1997, Debtor completed numerous credit card applications, obtained various accounts, and made a vast amount of

charges on them and some payments. By 1997, Debtor had accumulated a significant amount of credit card debt and was delinquent on her payments.

On November 26, 1997, the Power of Attorney was recorded at the office of the Recorder of Deeds in Erie County, Pennsylvania. On that same date, Mrs. Caron utilized the Power to Attorney to execute a Personal Care Agreement ("Agreement") on behalf of herself and on behalf of the Debtor as her Attorney-in-Fact. Mrs. Caron also executed a Promissory Note ("Note") and a Mortgage ("Mortgage") on the Debtor's residence which obligated the Debtor to pay Mrs. Caron and her husband, Paul Caron ("Mr. Caron") (or Angela Caron and Paul Caron, collectively, the "Carons") $25,000 plus interest in consideration for future services to be performed by the Carons under the Agreement. The Mortgage was recorded at the same time as the Power of Attorney.

Two months later, on January 26, 1998, the Debtor filed a voluntary Petition under Chapter 13 of the Bankruptcy Code. The Petition and the accompanying schedules and statement of financial affairs were signed by Mrs. Caron as attorney in fact for the Debtor. The bankruptcy schedules reflect assets of $59,336 which consist of the Debtor's residential real estate valued at $55,000 and personal property valued at $4,336. The scheduled liabilities reflect $31,480 in secured claims and $32,628.69 in general unsecured claims. Schedule I reflects monthly income of $650 and Schedule J reflects monthly expenses of $560.

The secured claims against Debtor's realty are shown as $6,480 due on a first mortgage to Niagara Consumer Discount Co. and $25,000 due to the Carons on the Mortgage. Except for approximately $4,000 in medical bills, the unsecured debt is owed to various credit card issuers.

The Debtor filed a proposed Chapter 13 Plan dated February 25, 1998 (the "Plan") again signed by Mrs. Caron as attorney in fact for the Debtor. The Plan contemplates a sale of the Debtor's residence for a price of $53,500 and distribution of the proceeds as follows:

| | |
|---|---|
| Selling costs | $ 5,350 |
| Chapter 13 Trustee fee | 2,675 |
| Debtor's attorney's fees | 1,000 |
| First mortgage | 6,480 |
| Caron mortgage | 25,000 |
| Debtor's exemption | 12,995 |
| | $53,500 |

The Plan also provides that "Debtor will pay a total of $1,000 to the general unsecured creditors to be distributed on a pro rata basis out of the funds which she could exempt."

The Chapter 13 Trustee filed objections to confirmation. The Trustee's view is that the Agreement and the Note and Mortgage transferred by the Debtor to the Carons executed two months prior to the bankruptcy filing (the "Transfer"), coupled with the Carons' claim of $25,000 from the proceeds of the sale of the Debtor's residence, and the Debtor's $15,000 exemption claim, represent not only bad faith, but an effort to defraud unsecured creditors from their entitlement to receive the non-exempt unencumbered equity in the Debtor's residence, and that the Plan represents "little more than a vehicle to transfer all of the equity in the [Debtor's] property to [Mrs. Caron] and to the Debtor." At a hearing on confirmation of the Plan on April 17, 1998, confirmation was continued generally, pending a decision on a fraudulent conveyance action to be filed by the Trustee seeking to avoid the transfer of the Mortgage to the Carons for the benefit of the bankruptcy estate.

On May 8, 1998, the Trustee filed his Complaint at Adversary Proceeding No. 98–1076 in which the Trustee seeks to avoid the transfer to the Carons as a fraudulent conveyance pursuant to 11 U.S.C. § 548, 550, 551 and 554 and the Pennsylvania Uniform Fraudulent Transfer Act ("UFTA"), 12 Pa. Cons.Stat.Ann. § 5101 et seq. (Purdon's 1998 Pamphlet).

In their Answer to the Complaint, the Carons deny that the transfer was made with actual intent to hinder, delay, or defraud the Debtor's creditors; deny that the Debtor received less than a reasonably equivalent value in exchange for the transfer; deny that the Debtor was insolvent at the time of the transfer; and deny that the Debtor intended to incur debts beyond her ability to pay as

such debts matured at the time of the transfer. The Carons also assert that the Agreement was already partially performed at the time of Debtor's bankruptcy filing and further assert that the Trustee must proceed under the Fraudulent Transfer provisions of the Bankruptcy Code or the UFTA, but not both.

On September 1, 1998, the Trustee filed a Motion for Summary Judgment as to Counts I, II, III, V and VI of the Complaint, and supporting brief. By Order dated September 4, 1998, the Court fixed a briefing schedule and fixed argument for November 13, 1998.

The Carons filed a Brief in Opposition to the Motion for Summary Judgment.

The Carons state:

There is no question that the transaction which the Trustee questions, meets several of the tenants (sic) required to set aside a transaction. The Carons would be considered insiders and there is no question that the transaction was entered into within six months prior to the filing of the bankruptcy.

The issue however, is whether the transaction was entered into to hinder, delay and/or defraud the Debtor's creditors. In this regard, it is necessary to review the Debtor's mental state and the effect of the transactions involved in the bankruptcy. As previously indicated, the Debtor is of diminished mental capacity and is not capable of caring for herself and/or entering into transactions. With this in mind, the Debtor has filed an objection to all of the claims that have been filed by the creditors asserting that they are owed money. The thrust of the Debtor's objection is that she did not have the mental capacity to enter a contract. Therefore, any transactions with the creditors are void.

In support of this position, the Debtor will establish that her mental state was such that she could not care for herself and did not realize the consequences of entering various transactions, which resulted in the filing of the bankruptcy. If the bankruptcy court then determines that the Debtor was incapable of entering into agreements, and they are void, the Trustee's position,

that the Personal Care Agreement caused the Debtor to become "insolvent, made with intent to hinder, delay or defraud the Debtor's creditors" is inaccurate. If the creditors' claims are not valid because of a lack of mental capacity on the part of the Debtor, then the Trustee's petition must fail.

At this point, it is premature for the Court to determine the merits of the Trustee's petition until such time as the Court rules on the validity of the objections filed by the Debtor to the claims.

After the Trustee filed his Motion for Summary Judgment, the Debtor on September 24, 1998 served its OBJECTION TO ALLOWANCE OF CLAIMS ("Objection"). Hearing on the Objection was also fixed for November 13, 1998. In the Objection, Debtor objects to the claims of 11 entities whose claims arise from credit card use by the Debtor. The Debtor alleges:

2. Each of the claims listed above represents a debt arising from a credit card or similar type of consumer loan transaction.

3. Each of the above claims should be disallowed because each was entered into at a time when the debtor lacked the mental capacity to comprehend the nature and character of the transaction and thus lacked the necessary capacity to contract with the claimants.

4. Because of her mental capacity, debtor obtained no substantial value from the transactions represented by the above claims and the Court should find that any agreements she may have made to pay the debts represented by the claims should be declared invalid and the claims disallowed.

One attorney filed a response to the Debtor's Objection on behalf of four of the credit card companies who hold unsecured claims in the total face amount of $9,238.08 (the "Respondents"). The Respondents allege that the Debtor was functional and understood the nature of the contractual relationships. They provided copies of her credit applications which the Debtor completed in 1994 and 1995, where the Debtor provided her social security number, annual household income, date of birth, and telephone number.

The Respondents also provided copies of Debtor's monthly statements which reflect numerous purchases by the Debtor and monthly payments. The Respondents further assert that if Debtor lacked the mental capacity to understand a credit card agreement, then she could not have the capacity to comprehend the Power-of-Attorney. The Respondents also point to the apparent "self-dealing" by Mrs. Caron.

At the time of the hearing on the Objection, Debtor's counsel announced a Stipulation with the Respondents, in which Debtor agrees to allow the claims of those four credit card companies in the amount of 80% of their claims as filed. Debtor requests a default order disallowing the claims of all other creditors named in the Objection. Debtor's counsel states that if the remaining credit card claims are disallowed, then the Carons will satisfy the Mortgage and have an unsecured claim and that the Debtor could file an Amended Plan to provide for the payment of 100% to unsecured creditors.

### Discussion

#### I. Objection to Claims

 The Debtor requests a default judgment against claimants who did not respond to the Objection. A bankruptcy judge may review the merits of an uncontested motion and should deny the motion if it lacks a merit basis for the relief sought. *In re Youngblood*, 212 B.R. 593, 595 (Bankr. N.D.Ill.1997). A nondefaulting party is not entitled to a default judgment as a matter of right. *In re Saylor*, 178 B.R. 209, 212–13 (9th Cir. BAP 1995) *affirmed* 108 F.3d 219 (9th Cir.1997), *citing Gordon v. Duran*, 895 F.2d 610, 612 (9th Cir.1990); *Bermudez v. Reid*, 733 F.2d 18, 21 (2nd Cir.1984) *cert. denied*, 469 U.S. 874, 105 S.Ct. 232, 83 L.Ed.2d 161 (1984); *Maggette v. Dalsheim*, 709 F.2d 800, 802 (2nd Cir.1983).

> The factors to be considered for entry of a default judgment include: (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect, and (7) the

> strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits. *Eitel v. McCool*, 782 F.2d 1470, 1471–72 (9th Cir.1986) (*citation omitted*).

*Saylor* at 213.

 Here, Debtor takes a "shot gun" approach to object to the claims of all claimants whose claims arise from a credit card or similar type transaction after the Trustee moves for Summary Judgment on his Complaint against the Carons. If the Trustee is successful, there are sufficient assets to pay the unsecured creditors a significant portion of their claims. Debtor's counsel, an experienced bankruptcy practitioner, is fully aware that many creditors in bankruptcy cases do not bother to file claims for the recovery of tiny "bankruptcy dollars" and that those who do, when faced with an objection to their claim, will not expend the time and money required to defend the claim. The Objection makes no reference to the pending litigation between the Trustee and the Carons and, therefore, without taking time to examine the entire record, the remaining respondents to the Objection would have no idea of the nature of Trustee's allegations in this case. The one group of Respondents who did file a response (all represented by the same attorney) did examine the record to learn of the related adversary action. Debtor readily agreed to allow the claims of those Respondents at 80% of their face amount.

We will not grant default judgments against the claimants who did not respond to the Objection which made no reference to the Trustee's Complaint or to the nature of the transfers to the Carons.

#### II. Trustee's Motion for Summary Judgment

We need only address Count II of the Complaint in which the Trustee seeks to avoid the transfer to the Carons as a fraudulent transfer under 11 U.S.C. § 548(a)(2) which provides:

> (a) The Trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the

petition, if the debtor voluntarily or involuntarily—

. . .

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

. . .

11 U.S.C. § 548(a)(2).

There is no question that the Transfer caused the Debtor to become insolvent. 11 U.S.C. § 101(32) defines insolvency as:

(32) "insolvent" means—

(A) with reference to an entity other than a partnership, and a municipality, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of—

(I) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and

(ii) property that may be exempted from property of the estate under section 522 of this title;

11 U.S.C. § 101(32).

Thus, before the Transfer, the calculation is as follows:

| Property | | Debts | |
|---|---|---|---|
| Residence (value per Schedules) | $55,000 | 1st Mortgage | $ 6,480 |
| Less exemption | 15,800 | Unsecured claims | 32,628 |
| Schedule B assets | All exempt | | |
| | $39,200 | | $39,108 |

After the Transfer, the Debtor is insolvent:

| Property | | Debts | |
|---|---|---|---|
| Residence (value per Schedules) | $55,000 | 1st Mortgage | $ 6,480 |
| Less exemption | 15,800 | Caron Mortgage | 25,000 |
| Schedule B assets | All exempt | Unsecured claims | 32,628 |
| | $39,200 | | $64,108 |

---

The Carons assert that the Debtor received reasonably equivalent value for the Transfer under the terms of the Agreement. Under the Agreement, the Carons are to watch out for the Debtor's general welfare, provide meals, lodging, assistance with transportation, and to manage Debtor's financial affairs. The Carons also expect to incur remodeling expenses for their home to make it suitable for Debtor's long-term residence. At the time of the first meeting of creditors, no remodeling expenses had been incurred even though the Debtor had resided with the Carons for the previous six months.

For purposes of § 548 of the Bankruptcy Code, value is defined in § 548(d)(2)(A) as "property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor . . . ." 11 U.S.C. § 548(d)(2)(A). None of the items of consideration in the Agreement constitute property received or the securing of satisfaction of present or antecedent debt. The future services to be provided by the Carons include feeding and housing the Debtor, providing assistance with transportation, and managing the Debtor's finances. All of these items constitute "support" and are not counted as value. In addition, the cost expected to be incurred by the Carons to remodel their home to make it suitable for the Debtor's long-term residency is related to the provision of housing for the Debtor and would also be counted as part of the promised support.

Pennsylvania Law is no different. As stated in *Toff v. Vlahakis,* 380 Pa. 512, 517–18, 112 A.2d 340, 343 (1955):

> Even if Mrs. Vlahakis acted throughout, as she claims she did, merely as her husband's agent and spent the moneys which she received from him for his use and benefit, the transfer was no less fraudulent as to his creditors. Her status as agent would not clothe her with any broader authority to deal with her insolvent husband's assets than he himself had. The fact is that, in his insolvent situation, Vlahakis' authority to dispose of his assets was considerably circumscribed. When he assigned his leasehold to Redman on May 17, 1951, he knew he was insolvent; less than three weeks later, June 5th, he sold his restaurant fixtures for the benefit of his creditors; and it was just two months after the assignment, viz., on July 20th, that his creditors petitioned the District Court of the United States to declare him bankrupt. In these circumstances, Vlahakis was no longer free to use his assets for his own personal benefit which would necessarily be to the corresponding detriment of his creditors. In *Commonwealth v. Smith,* 344 Pa. 381, 25 A.2d 694, 696, where a creditor attacked as fraudulent a conveyance of property from a mother to her son made without fair consideration, the son attempted to defend on the ground that the property had been conveyed to him in consideration of his agreeing to support his mother in the future. In rejecting the defense, this court, speaking through Mr. Justice Stern, said, 'Even if true, and even though an agreement to that effect had been made in advance by mother and son, it would not defeat the rights of plaintiff, because, where a conveyance of property is made in consideration of an agreement to support the grantor in the future, it is invalid as to creditors if by the conveyance the grantor renders himself unable to pay his debts, the theory being that a conveyance whereby a debtor puts his property beyond the reach of his creditors under an agreement that it shall be devoted in any way to his own use is constructively fraudulent [citing cases].' See, also, *Commonwealth Trust Co. of Pittsburgh v. Cirigliano,* 352 Pa. 108, 111, 41 A.2d 863. What Vlahakis, because of his distressed financial condition, could not do with his assets, his wife may not do for him.

*Id.*

■ The purported consideration of future support and remodeling expense for the Note and Mortgage do not constitute value at the time of the Transfer. The Transfer caused the Debtor to become insolvent and no reasonably equivalent value was given to the Debtor in exchange for the Transfer. Under § 548(a)(2), no proof of actual intent to hinder, delay, or defraud creditors is required. *In re Chomakos,* 170 B.R. 585, 588 (Bankr. E.D.Mich.1993), *affirmed* 69 F.3d 769 (6th Cir.1995) *cert. denied* 517 U.S. 1168, 116 S.Ct. 1568, 134 L.Ed.2d 667 (1996). The Trustee is entitled to Summary Judgment on his Complaint to avoid the Transfer for the benefit of creditors.

### III. Carons' Status as Unsecured Creditors

■ Debtor's counsel has stated that if the unsecured claims of the credit card companies are disallowed, then the Carons will satisfy the Mortgage and hold only an unsecured claim. We have already determined that the claims of the credit card companies will not be disallowed, but think it appropriate to discuss the status of any unsecured claim which the Carons may assert on account of avoidance of their Note and Mortgage.[1]

The Carons have not articulated any benefit which was provided the Debtor prior to the bankruptcy filing except to assert that the Debtor lived with them for six months. We do not know whether any of the Debtor's monthly income went to the Carons during that six month period or what services the Carons may have provided. However, any

---

1. Equitable subordination of a claim under § 510(c) requires notice and a hearing. The Carons have yet to assert an unsecured claim. Therefore, this discussion only serves as guidance and if the Carons assert an unsecured claim which is objected to, we will revisit the issue at that time.

unsecured claim asserted by the Carons would be limited in amount to the reasonable value of any services provided prior to the bankruptcy filing for which they had not received payment.

To the extent that the Carons would claim a greater amount, the claim would be subject to subordination under 11 U.S.C. § 510(c).

> Before ordering equitable subordination, most courts have required a showing involving three elements: (1) the claimant must have engaged in some type of inequitable conduct, (2) the misconduct must have resulted in injury to the creditors or conferred an unfair advantage on the claimant, and (3) equitable subordination of the claim must not be inconsistent with the provisions of the bankruptcy code. *U.S. v. Noland,* 517 U.S. 535, 116 S.Ct. 1524, 134 L.Ed.2d 748 (1996) (describing existing case law as consistent with the three part test identified in *In re Mobile Steel Co.,* 563 F.2d 692, 700 (5th Cir.1977)).

*Citicorp Venture Capital, Ltd. v. Committee of Creditors Holding Unsecured Claims,* 160 F.3d 982, 986–87 (3rd Cir.1998).

The Court of Appeals for the Third Circuit has not decided whether misconduct is always a prerequisite to equitable subordination:

> This court, in *In re Burden v. United States,* 917 F.2d 115, 120 (3rd Cir.1990), concluded that "creditor misconduct is not [always] a prerequisite for equitable subordination." *Burden* involved subordination of a tax penalty in the absence of government misconduct. The Supreme Court, in two recent cases regarding the standards for tax penalty subordination, has refused to decide whether misconduct is required under § 510(c), resolving each case on the principle that "categorical" subordination is not permissible. *See United States v. Reorganized CF & I Fabricators of Utah, Inc.,* 518 U.S. 213, 229, 116 S.Ct. 2106, 135 L.Ed.2d 506 (1996); *Noland,* 517 U.S. at 543, 116 S.Ct. 1524, 134 L.Ed.2d 748. We need not here resolve the issue of whether misconduct is always a prerequisite to eq-

uitable subordination because the bankruptcy court properly found misconduct. *Id.* at 987, FN. 2.

■ The circumstances here would warrant equitable subordination of any claim for future services. Future services are not considered consideration for a present transfer. The Social Security Administration has determined the amount the Debtor is to receive each month for her support. Yet, the Debtor and Mrs. Caron or Mrs. Caron alone, acting on behalf of the Debtor, determined that such amount was insufficient. Actions were taken to place all of the Debtor's property beyond the reach of the Debtor's unsecured creditors and to confer an unfair advantage on the Carons. Similarly, the allowance of the Carons' unsecured claim for future care confers an unfair advantage upon them. Debtor receives a monthly income from which she can pay for her future support. It would be inappropriate for the Carons to receive a distribution from the estate for services to be provided in the future, on par with other unsecured creditors who have provided goods and services to the Debtor prior to the bankruptcy filing.

## IV. Conclusion

We view the transfer made by Mrs. Caron acting on behalf of the Debtor to the Carons two months before Mrs. Caron acting on behalf of the Debtor filed the within case, and the use of the omnibus objection to claims process as a plan for the Carons (and the Debtor to the extent of her exemption) to walk off with all of the Debtor's non-exempt assets in exchange for a non-binding Agreement for the Carons to provide services in the future under a personal care agreement, a contract not recognized as consideration under Pennsylvania law and to shuck off Debtor's unsecured creditors in the process. While the Debtor may be in need of care and the Carons may have good intentions with respect to the Debtor, we cannot countenance such a fleecing of the creditors.

Appropriate Orders will be entered which refuse the Debtor's request for a default order on its objections to claims and grants the Trustee's Motion for Summary Judgment on the Complaint to Avoid the Note and

Mortgage. Since those creditors who filed a response to the Debtor's Objection fully understood the nature of the transaction and the activities in this case, we will approve their Stipulation by separate Order.