NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 08a0612n.06
Filed: October 10, 2008

Nos. 07-3319, 07-3320

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

In re: JAMES A. FISHER,

    Debtor

-----------------------------

RHONDA BRENNAN, JAMES A. FISHER,

    Appellants Cross-Appellees,

        v.

RUTH A. SLONE, Trustee,

    Appellee Cross-Appellant.

On Appeal from the United States District Court for the Southern District of Ohio at Dayton

_____/

**Before:**     **GUY, RYAN, and McKEAGUE, Circuit Judges.**

    **RALPH B. GUY, JR., Circuit Judge.**     Bankruptcy trustee Ruth A. Slone brought this adversary proceeding seeking to avoid certain pre-petition transfers of money and property between James A. Fisher, the debtor, and Rhonda Brennan. The bankruptcy court rejected the trustee's claims with respect to transfers of money between defendants Fisher and Brennan, but found in favor of the trustee with respect to the sale of inventory by Fisher, as the *alter ego* of Fisher Data Products, Inc. (FDP), to Brennan. Both the trustee and the defendants appealed, and the district court affirmed. *Slone v. Brennan, et. al. (In re Fisher)*,

362 B.R. 871 (S.D. Ohio 2007).

Defendants appeal to this court, challenging the trustee's standing, the finding that FDP was Fisher's *alter ego*, and the determination that the sale of inventory to Brennan was fraudulent under 11 U.S.C. § 548(a)(1) (2003).[1] On cross-appeal, the trustee argues that the bankruptcy court committed several errors in concluding that certain of the pre-petition transfers of money were not fraudulent. After review of the record, the arguments presented on appeal, and the applicable law, we affirm the judgment of the bankruptcy court.

## I.

In 1994, James A. Fisher, an engineer, formed Fisher Data Products (FDP) as a "subchapter S" corporation. Fisher was the sole shareholder of both FDP and JR Properties, LLC, which owned the property where FDP was located. Fisher and FDP were both in financial trouble by 1999. FDP had borrowed money from several financial institutions, including National City Bank. Fisher not only borrowed money in his own name, but also personally guaranteed most of the loans to FDP. FDP began defaulting on its loans in 2000, and National City obtained judgment against FDP in November 2002. FDP was dissolved, its patents were sold to Globe Products, Inc., and Fisher began working for Globe on a contract basis in January 2003. Fisher filed for personal bankruptcy on April 16, 2003.

### A.      Monetary Transfers

Fisher met Rhonda Brennan in 1998, when she started working for FDP in sales and

---

[1]Because Fisher filed for bankruptcy before the effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23 (2005), all references are to the pre-amendment version of the bankruptcy code.

marketing. They became romantically involved in 2000, and Fisher moved into Brennan's home in 2001. Brennan purchased a new home in May 2002, where she and Fisher lived together from that time forward. The bankruptcy court found that they shared financial responsibility for the expenses of the home and of raising their respective children. Brennan's responsibilities grew at FDP until she went on voluntary layoff in July 2002. She remained unemployed until she began working for Globe on a contract basis in January 2003.

Examining the financial records, the bankruptcy court found that there were 87 transfers of money between Fisher and Brennan from December 2000 through April 16, 2003. Eight transfers occurred more than a year before the bankruptcy filing—three from Fisher to Brennan totaling $15,000, and five from Brennan to Fisher totaling $15,000. In the year preceding the bankruptcy filing, there were 16 transfers from Fisher to Brennan totaling $33,233.11 and 63 transfers from Brennan to Fisher totaling $34,600.98. The bankruptcy judge found these transfers did not represent loans, but were simply the transfer of funds between cohabitating persons with shared financial responsibilities. Finding that the sums were expended for ongoing household expenses and that Fisher received reasonably equivalent value for the sums he transferred to Brennan, the bankruptcy court concluded that the transfers were not fraudulent under the bankruptcy code or Ohio law.

**B.    Sale of Inventory**

Although FDP was no longer a viable business as of November 2002, it still had assets in the form of patents, outstanding orders, and inventory specifically designed for use with certain patents. When Fisher approached Globe about purchasing FDP, the discussions

turned to the purchase of certain patents and the future employment of Fisher. In a memorandum from December 2002, W. Patrick Winton of Globe stated that he and Fisher talked about getting National City Bank, which held a security interest in FDP's inventory, to assign the inventory to Globe so that Globe could purchase the parts as they were needed to complete FDP's back orders. In another memorandum from December 2002, Winton stated: "JAF is arranging to take the raw stock and is working this out with the bank. We do not have to agree to buy any of the stock, but it will be available to us. I assume he will get this deal done."

Fisher and Brennan recognized that the inventory, appraised for National City at a liquidation value of $3,000, represented a business opportunity because it had substantially greater value to Globe. If Fisher took the inventory personally, however, it could be lost to the trustee when he filed for bankruptcy. Instead, the inventory would be sold to Brennan. In January 2003, Brennan wrote to National City offering to purchase certain FDP inventory and shelving for $3,800. National City responded that although it held a security interest in the inventory, the property was owned by FDP and any offer to purchase should be directed to Fisher. On January 23, 2003, Brennan sent a letter to Fisher offering to purchase the inventory for $3,850. The evidence showed that National City approved the sale to Brennan, that Fisher accepted her offer, and that Brennan paid by check dated February 3, 2003. The proceeds of the sale went to National City, which released its security interest in the inventory purchased by Brennan.

Brennan moved the inventory to Globe's facility. On February 7, 2003, less than a

week later, Globe made its first purchase from Brennan's inventory for the sum of $10,326.11. At Fisher's direction, Globe continued to make purchases from Brennan through October 2004. The bankruptcy court found that Globe paid a total of $99,128.65 to Brennan for inventory, which she used not only as supplemental income but also to make "gifts" to former employees of FDP who were owed back pay. At the time of trial in October 2005, some portion of the inventory had still not been sold.

## C.    Procedural History

The trustee brought this "core" adversary proceeding seeking to avoid the transfers of money and inventory as preferential or fraudulent under the bankruptcy code and Ohio law. Trial was conducted over two days, and the bankruptcy court issued a written memorandum decision in January 2006. While rejecting the trustee's claim with respect to the monetary transfers, the bankruptcy court nonetheless found that FDP was Fisher's *alter ego* and that Fisher's transfer of the inventory to Brennan could be avoided for actual or constructive fraud under 11 U.S.C. § 548(a)(1)(A) and (B).[2]

Damages were awarded to the trustee in the amount of $99,128.65—the proceeds of Brennan's sale of the fraudulently transferred inventory. Brennan was also ordered to provide an accounting and to turn over any remaining inventory to the trustee. The district court affirmed, and these appeals followed.[3]

---

[2]The bankruptcy court did not find it necessary to decide whether the transfer of inventory was also preferential under 11 U.S.C. § 547, or whether the money Brennan used to purchase the inventory could be traced to the deposit by Fisher of a paycheck into Brennan's bank account.

[3]Defendants' motion to supplement the record in the district court was denied because these appeals had been filed. Defendants have made a similar motion in this court, which we will discuss in connection

## II.

Although the parties raised the same issues in the district court, this court reviews the bankruptcy court's decision directly rather than the district court's review of that decision. *Stevenson v. J.C. Bradford & Co. (In re Cannon III)*, 277 F.3d 838, 849 (6th Cir. 2002); *see also Corzin v. Fordu (In re Fordu)*, 201 F.3d 693, 696 n.1 (6th Cir. 1999). Accordingly, we review the bankruptcy court's findings of fact for clear error, and its conclusions of law *de novo*. *Behlke v. Eisen (In re Behlke)*, 358 F.3d 429, 433 (6th Cir. 2004).

Both the appeal and cross-appeal arise from the trustee's authority under Section 548 of the Bankruptcy Code to avoid "any transfer of an interest of the debtor in property" made within one year before the filing of the bankruptcy petition

> . . . if the debtor voluntarily or involuntarily—
>
> (A) made such transfer . . . with actual intent to hinder, delay, or defraud any entity to which the debtor was or became . . . indebted; or
>
> (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>
> (ii) (I) was insolvent on the date that such transfer was made . . . , or became insolvent as a result of such transfer . . . ;

11 U.S.C. § 548(a)(1).[4]

The bankruptcy judge found at the outset that the defendants' testimony was

---

with the argument that the trustee lacked standing.

[4]The trustee also sought to avoid the transfers under 11 U.S.C. § 544(b), under which a trustee may avoid a transfer made when the transferor was insolvent if the transfer is voidable under state law. *Corzin*, 201 F.3d at 697 n.3. Ohio law provides for avoidance where the transfer is made "with actual intent to hinder, delay, or defraud any creditor," or "without receiving a reasonably equivalent value in exchange for the transfer or obligation." OHIO REV. CODE § 1336.04(A)(1) and (2). The trustee draws on substantive Ohio law, but the parties do not argue the § 544(b) claims separately.

"completely lacking in credibility," was "beyond reason" at times, and conflicted with each other and their own prior deposition testimony. For these reasons, the bankruptcy judge drew only nonessential facts from their testimony and concluded that the written evidence—in the form of financial summaries, emails, and contemporaneous memoranda—provided the only reliable evidence concerning the intentions of the parties at the time of the transactions. This finding is entitled to deference, and will not be set aside absent clear error.

## A.    Monetary Transfers

The bankruptcy court characterized the trustee's claims with respect to the transfers of money as resting entirely on evidence that the defendants "clearly knew that a bankruptcy was close at hand and planned for it." Although more than $45,000 in transfers were challenged at trial, the trustee restricted her appeals, both here and in the district court, to a subset of transfers from Fisher to Brennan that occurred between November 2002 and the bankruptcy filing in April 2003. Those eleven transfers totaled $18,749.97. As the district court noted, the trustee has not articulated any basis for distinguishing these transfers from the rest. We infer from the trustee's arguments that the distinction lies in the manner in which Fisher made these transfers. Specifically, the evidence showed that Fisher stopped using his own bank account in November 2002 and deposited almost all of his paychecks from Globe directly into Brennan's account until after the bankruptcy petition was filed in April 2003.

The bankruptcy court was not persuaded that those transfers should be treated differently, and found with respect to all of the monetary transfers that Fisher and Brennan

shared responsibility for the household expenses; that their partnership was akin to marriage as opposed to a debtor-creditor relationship; and that the money transferred to Brennan was in fact used to meet their ongoing combined obligations for house payments, utility bills, and personal expenses. It was also significant that Fisher received more money from Brennan than she received from him over the entire period, as well as during the one year that preceded the bankruptcy filing. The bankruptcy court found that although defendants' testimony was evasive and contradictory, the evidence did not establish actual or constructive fraud under 11 U.S.C. § 548(a)(1)(A) or (B).

### 1.     Constructive Fraud

With respect to constructive fraud, the trustee argues that the bankruptcy court erred by "netting" the transfers between Fisher and Brennan to conclude that Fisher received "reasonably equivalent value" in exchange for such transfers. The trustee argues specifically that our decision in *Chamakos* requires that each transfer be analyzed separately. *Chomakos v. Flamingo Hilton (In re Chomakos)*, 69 F.3d 769, 771 (6th Cir. 1995). The trustee, however, overstates the holding in that case.

The transfers at issue in *Chomakos* were bets placed at a regulated gambling casino, and the question presented was when the value of those transfers should be determined. It was in this context that we found the value of the rights obtained by placing the bets should be determined at the time the transfer was made—not after it was known that the debtors had lost those bets. The court explained that the fact that the debtors lost more than they won did not establish that they had not received reasonably equivalent value for the transfers. That

is not the same, however, as saying that the court must consider each transfer separately. Indeed, as the district court noted, we have recognized that transfers may be considered together when appropriate. *See Corzin v. Fordu (In re Fordu)*, 201 F.3d 693 (6th Cir. 1999) (considering several items of property transferred as part of a divorce settlement).

"[T]he test used to determine whether a transfer was supported by reasonably equivalent value focuses on whether there is a reasonable equivalence between the value of property surrendered and that which was received in exchange." *Corzin*, 201 F.3d at 708. Although the bankruptcy court found reasonable equivalence in the amounts transferred between Fisher and Brennan, the trustee is correct that there was no explicit finding that the transfers from Fisher to Brennan were "in exchange for" the transfers from Brennan to Fisher. Nonetheless, what is explicit is the bankruptcy court's factual finding that the challenged transfers were for Fisher's share of the ongoing expenses of running their household. As this court recently explained,

> the greater weight of authority holds, in cases applying state statutes comparable to the [Fair Debt Collection Procedures Act (FDCPA)] as well as in bankruptcy cases applying a similar fraudulent transfer provision [in § 548(a)(1)(B)] that a debtor does indeed receive "reasonably equivalent value" when he/she makes payments to his/her spouse (or cohabitant) that are used for household expenses.

*United States v. Goforth*, 465 F.3d 730, 736 (6th Cir. 2006) (footnote omitted) (citing cases).

This is sufficient to defeat the trustee's claim of constructive fraud, and distinguishes this case from those in which the transfer was not for "value" because it was in exchange for an "unperformed promise to furnish support to the debtor or a relative of the debtor." 11 U.S.C. § 548(d)(2)(A) (defining "value" as "property, or satisfaction or securing of a present

or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor"); *see, e.g., Taunt v. Hurtado (In re Hurtado)*, 342 F.3d 528, 530-32 (6th Cir. 2003) (finding that admittedly fraudulent transfers to mother-in-law were held by her and used to provide future support for debtors); *Simione v. Nationsbank of Del., N.A. (In re Simione)*, 229 B.R. 329, 335 (Bankr. W.D. Pa. 1999) (stating that "where a conveyance of property is made in consideration of an agreement to support the grantor in the future, it is invalid as to creditors").

### 2.      Actual Fraud

Next, the trustee argues that the bankruptcy judge confused "actual" and "constructive" fraud by concluding that actual fraud could not be established if reasonably equivalent value was given.  Although the two theories were discussed together, we read the bankruptcy court's decision to reflect distinct conclusions with respect to actual and constructive fraud based on a common set of facts.  In fact, emphasizing that the transfers to Brennan were used to pay the bills that the defendants shared as cohabitants, the bankruptcy court specifically found that none of the evidence presented at trial showed that the challenged transfers were made with "intent to hinder, delay, or defraud" any of the debtor's creditors.  11 U.S.C. § 548(a)(1)(A).

The trustee also argues that the bankruptcy court erred by failing to recognize that the presence of several "badges of fraud" was sufficient to shift the burden to the defendants to show that the transfers were not fraudulent.[5]  Under Ohio law, although the ultimate burden

---

[5]Ohio's Uniform Fraudulent Transfer Act provides a non-exclusive list of relevant factors, referred to as "badges of fraud," that includes:  (1) whether the transfer was to an insider, (2) whether the debtor

of proof in an action to set aside a fraudulent conveyance rests with the creditor, consideration of the relevant factors *may* give rise to an inference of fraudulent intent that shifts the burden to the defendant to show that the conveyance was made for fair consideration. *Cardiovascular & Thoracic Surgery of Canton, Inc. v DiMazzio*, 524 N.E.2d 915 (Ohio Ct. App. 1987) (syllabus). Although a few of the factors were certainly present—including that Fisher was or became insolvent and that the transfers were to an insider—the focus of the trustee's argument was that Fisher stopped using his own bank account in November 2002 and deposited nearly all of his paychecks from Globe directly into Brennan's bank account. Asked about that during his deposition, Fisher testified that he did so in part because he was concerned about possible garnishment for child support that he later learned had already been collected out of a tax refund.

Despite Fisher's abandonment of his bank account during this period, the bankruptcy court specifically found that the transfers to Brennan both before and after November 2002 were in fact used to pay the debtor's share of the ongoing expenses of maintaining their combined household. It was not clear error for the bankruptcy court to conclude that these monetary transfers were not made with actual intent to hinder, delay, or defraud any of Fisher's creditors. *See Bennett & Kahnweiler Assocs. v. Ratner (In re Ratner)*, 132 B.R. 728,

---

retained possession or control of the property, (3) whether the transfer was concealed, (4) whether the debtor had been sued or threatened with suit, (5) whether the transfer was of substantially all of the debtor's assets, (6) whether the debtor absconded, (7) whether the debtor removed or concealed assets, (8) whether the value received was reasonably equivalent to the value of the asset transferred, (9) whether the debtor was or became insolvent after the transfer, (10) whether the transfer was made shortly before or after a substantial debt was incurred, and (11) whether the debtor transferred the essential assets of a business to a lienholder who transferred the assets to an insider of the debtor. OHIO REV. CODE § 1336.04(B).

733 (N. D. Ill. 1991) (holding that debtor's depositing of funds into spouse's separate account did not establish actual intent to hinder, delay, or defraud creditors for purposes of denial of discharge under Chapter 7); *Glaser v. Glaser (In re Glaser)*, 49 B.R. 1015, 1019 (S.D.N.Y. 1985) (finding no actual fraud in transfer of commission check to wife who deposited it into her own account, retained $200 per week for household expenses, and returned the remainder to the debtor to finance business operations).[6]

Accordingly, we affirm the judgment in favor of defendants with respect to the monetary transfers between Fisher and Brennan.

**B.     Transfer of Inventory**

The judgment in favor of the trustee rested on the bankruptcy court's finding that the pre-petition transfer of FDP's inventory to Brennan constituted a fraudulent transfer. That is, the bankruptcy court found that Fisher was FDP's *alter ego*; that the recovered inventory and the proceeds Brennan received from the sales to Globe were property of the estate under 11 U.S.C. § 541(a)(3) and (a)(6); and that the transfer was made with "actual intent to hinder, delay, or defraud" any entity to which the debtor was or became indebted under 11 U.S.C. § 548(a)(1)(A). The district court affirmed, addressing the same arguments made here and rejecting the defendants' contention that the trustee lacked standing to avoid this transaction because she did not have any financial interest in the outcome. *Slone*, 362 B.R. at 884-86.

---

[6]Defendants assert in a footnote that Fisher's deposition testimony was only admissible for impeachment purposes and not as substantive evidence. As both the bankruptcy court and the district court found, however, since Fisher testified at trial and was subjected to cross-examination, his deposition testimony was admissible both for impeachment and as substantive evidence. FED. R. CIV. P. 32(a)(1); FED R. BANKR. P. 7032; FED. R. EVID. 801(d)(1).

1.      **Standing**

Issues raised for the first time on appeal are generally not considered. *Poss v. Morris (In re Morris)*, 260 F.3d 654, 663 (6th Cir. 2001). To the extent that defendants' argument is a challenge to standing, however, it presents a jurisdictional question that may be raised at any time. *Stevenson*, 277 F.3d at 852. Whether a plaintiff has standing is a legal question, which we review *de novo*. *Id.* at 853.

In an effort to bolster their arguments on standing, defendants seek to supplement the record with documents that were filed in the bankruptcy court but not made part of the record before the district court. While there may be limited discretion to supplement the record under Fed. R. App. P. 10(e)(3), the documents do not support the defendants' contention that National City retained a security interest in the inventory. Defendants emphasize, as Fisher explained in an accompanying affidavit, that National City took a broad security interest in all of FDP's assets and their proceeds in connection with loans made to FDP totaling $850,000. That security interest was recorded in a UCC-1 Financing Statement filed in June 2000, and a "continuation" of the UCC-1 was filed post-petition in January 2005. Defendants also point to two claims National City filed in the bankruptcy proceeding reflecting debt of $665,287.78, but those claims were listed as unsecured. These documents show National City was undersecured—a fact that was never in dispute—but they do not establish that National City retained a security interest in the inventory after the transfer to Brennan. Indeed, defendants conceded that National City approved the sale of and released its security interest in the inventory such that Brennan held the inventory free of National

City's lien. As a result, we need not decide whether to recognize an inherent authority to supplement the record. *See*, *e.g.*, *United States v. Husein*, 478 F.3d 318, 336 (6th Cir. 2007) (noting that some courts, but not the Sixth Circuit, have relied on inherent authority to supplement the record).

Defendants rely heavily on this court's decision in *Melamed* to support the argument that the trustee was without standing to seek to avoid the transfer of the inventory. *Melamed v. Lake County Nat'l Bank*, 727 F.2d 1399 (6th Cir. 1984). This reliance is misplaced. Defendants quote from *Melamed* in a way that misrepresents the court's holding concerning standing, which pertained not to the fraudulent transfer claim but to a separate claim for tortious interference under state law. In that claim, the trustee argued that the bank, a secured creditor, imposed such strict controls on the debtor that it destroyed the debtor's business and injured the other creditors. The court in *Melamed* agreed with the bank that the trustee did not have standing to assert claims belonging to the creditors under former 11 U.S.C. § 110(a). *Id*. at 1404. That conclusion is consistent with the general principle that a bankruptcy trustee does not have standing to assert claims that belong to specific creditors. *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416 (1972); *see also Stevenson*, 277 F.3d at 853 (explaining that "the prudential principles of standing under Article III and the trustee's powers under the bankruptcy code are coextensive . . . [such that] 'if a trustee has no power to assert a claim because it is one not belonging to the bankruptcy estate, then he also fails to meet the prudential limitation that the legal rights asserted must be his own'") (citation

omitted).[7]

When the trustee in this case responded that she was not asserting a claim belonging to National City, defendants denied that this was their contention and accused the trustee of constructing a "straw man" argument. Plainly, the trustee's avoidance action did not assert a claim belonging to National City, but rather sought to avoid a transfer for the benefit of the estate. *Hatchett v. United States*, 330 F.3d 875, 886 (6th Cir. 2003) (noting that only trustee has exclusive authority to bring avoidance action during bankruptcy proceedings).

Reframing the argument, defendants direct attention to the portion of *Melamed* in which the court concluded that the fraudulent transfer claim failed because the transfer did not diminish the assets of the debtor. Aside from the not insignificant fact that this was not a finding as to standing, the holding is inapplicable to the transfer at issue in this case. The debtor in *Melamed* received a down payment of $30,000 to order equipment for a customer. When the down payment was deposited with the bank, which held a security interest in the debtor's accounts receivable, the bank applied the deposit to the secured debt. The bankruptcy trustee sought to avoid the transfer of the $30,000 from the debtor to the bank, but this court held that "because of the Bank's valid security interest in accounts receivable, the transfer did not diminish the assets of the debtor which were available to its creditors." *Melamed*, 727 F.2d at 1402.[8]

---

[7]In *Stevenson*, we held that the trustee lacked standing where the property—funds deposited into escrow accounts in express trust for the debtor's clients—never belonged to the debtor and any recovery would be for the benefit of the debtor's clients and not the bankruptcy estate.

[8]The customer, however, successfully sued the bank for misrepresentation, and that judgment was affirmed in a separate appeal. *Id.*

The trustee concedes, as she must, that this holding would have application if she had challenged the transfer of the proceeds between Fisher and National City because National City retained a security interest in the proceeds of the sale of the inventory to Brennan. Here, the trustee did not seek to avoid a transfer to a secured party, but rather sought to avoid the sale of the inventory to Brennan. The fact that National City released its security interest in the inventory distinguishes this case from *Melamed*.

Defendants argue next that the trustee lacked standing because the bankruptcy estate would not benefit from the recovery of the transferred property or its proceeds. Avoidance and recovery are distinct, with the former a necessary precondition for the latter. *Surhar v. Burns (In re Burns)*, 322 F.3d 421, 427 (6th Cir. 2003). Section 550 provides, in part, that to the extent a transfer is avoided under other provisions, including § 548, the trustee may recover the property transferred, or the value of such property, "for the benefit of the estate." 11 U.S.C. § 550(a). In *Wellman*, on which defendants rely, the debtor-in-possession gave certain creditors conditional non-recourse notes to be paid out of any recovery or settlement in actions under § 550. The district court found that the debtor gave these notes in an attempt to create a claim in the estate in order to bring avoidance actions to secure a "massive surplus recovery." Finding that the debtor brought the avoidance action on his own behalf, and not for the benefit of the estate, the court concluded that the debtor had no standing. *Wellman v. Wellman*, 933 F.2d 215, 218-19 (4th Cir. 1991). The same cannot be said of the trustee in this case.

In a similar vein, defendants argue that the recovery was not for the benefit of the

estate because the property that was the subject of the avoided transfer was fully encumbered. Defendants rely specifically on *Barber v. McCord Auto Supply, Inc. (In re Pearson Indus., Inc.)*, 178 B.R. 753 (Bankr. C.D. Ill. 1995), for the proposition that the trustee may not recover when the property was encumbered by liens that exceeded the value of the property. Not articulated as an Article III standing issue, the court held that the trustee could not prevail on the recovery action because the property remained subject to a security interest. *Id*. at 765.

Critical to that determination, however, was the stipulation that the creditor's security interest had attached to the inventory transferred to the pawnbroker and that *the security interest continued in the inventory after the transfer*. *Id*. at 764-65. It was for this reason that the court found the recovery was not for the benefit of the estate. *Id*.; *see Mellon Bank, N.A. v. Dick Corp.*, 351 F.3d 290, 293 (7th Cir. 2003) (clarifying that § 550's "benefit to the estate" denotes the set of all potential interested parties rather than any particular class of creditors). Defendants have not demonstrated either that National City maintained a security interest in the inventory itself after it approved the sale to Brennan. The unsold inventory and the proceeds of Brennan's sales to Globe are part of the bankruptcy estate, which includes not only any interest in property that the trustee recovers under § 550 and, in turn, § 548, but also the proceeds or profits of or from property of the estate. 11 U.S.C. § 541(a)(3) and (6).

Finally, defendants argue in their third brief in this court that the trustee lacked standing to bring an *alter ego* claim even on behalf of general unsecured creditors. In

support of this proposition, defendants rely on *Mixon v. Anderson (In re Ozark Restaurant Equipment Co.)*, 816 F.2d 1222 (8th Cir. 1987), and *DSQ Property Co. v. DeLorean*, 891 F.2d 128 (6th Cir. 1989). Both cases involved application of the holding in *Caplin* that the trustee does not have standing to assert claims on behalf of specific creditors. The court in *Mixon* held that, under Arkansas law, an *alter ego* claim brought against the principals of the debtor corporation is not a claim belonging to the corporation or its shareholders, but one that runs to the corporate creditors personally. 816 F.2d at 1225. The trustee is not asserting such a claim here, and other courts have recognized that a bankruptcy trustee has standing to raise an *alter ego* theory in a trustee's action to collect the assets of the estate. *Koch Refining v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1349-50 (7th Cir. 1987); *see also Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 132-34 (2d Cir. 1993); *Towe v. Martinson*, 195 B.R. 137, 140 (D. Mont. 1996).

Concluding that the trustee had standing to pursue the fraudulent transfer claim with respect to the inventory, we turn to the defendants' arguments with respect to the merits.

2. ***Alter Ego***

The bankruptcy court recognized that FDP was a separate legal entity from its sole shareholder, James Fisher. *Zimmerman v. Eagle Mortgage Corp.*, 675 N.E.2d 480, 485 (Ohio Ct. App. 1996). Under Ohio's *alter ego* doctrine, "where the stock of a corporation is owned entirely by one party, and the party in interest is the stockholder, the fiction of the separate entity of the corporation may be disregarded where the ends of justice require it." *Knight v. Burns*, 154 N.E. 345, 346 (Ohio Ct. App. 1926).

Defendants argue that the bankruptcy court improperly applied reverse-piercing of the corporate veil, which has not been recognized in Ohio. To be sure, the Ohio courts have not adopted reverse-piercing, despite acknowledging that it has been permitted by other courts in limited cases where the corporation was found to be the *alter ego* of its controlling shareholders and a creditor was seeking assets of the corporation to satisfy the debts of the controlling *alter ego*. *Geiger v. King*, 815 N.E.2d 683, 685 (Ohio Ct. App. 2004). This court has explained, however, that veil piercing and *alter ego* concepts are distinct. The former asks a court to hold A vicariously liable for B's debts, while the latter asserts that A and B are the same entity and therefore liability is direct. *IUAU Local 600 v. Aguirre*, 410 F.3d 297, 302 (6th Cir. 2005). Here, the bankruptcy court found that because Fisher and FDP were the same entity, FDP's inventory belonged to Fisher such that the transfer to Brennan was a transfer of an interest in property of the debtor.

In Ohio, the courts may consider a number of nonexclusive factors in deciding whether to disregard the corporate fiction under the *alter ego* theory. Those factors include: "(1) grossly inadequate capitalization, (2) failure to observe corporate formalities, (3) insolvency of the debtor corporation at the time the debt is incurred, (4) shareholders holding themselves out as personally liable for certain corporate obligations, (5) diversion of funds or other property of the company property for personal use, (6) absence of corporate records, and (7) the fact that the corporation was a mere facade for the operations of the dominant shareholder(s)." *Taylor Steel, Inc. v. Keeton*, 417 F.3d 598, 605 (6th Cir. 2005); *see also Carter-Jones Lumber Co. v. LTV Steel Co.*, 237 F.3d 745, 749 (6th Cir. 2001). The

bankruptcy court made the following findings:

> The parties did not specifically argue these points at trial and the Trustee inexplicably presented no evidence regarding Fisher's actions with regard to the corporate formalities required for the separateness of FDP. FDP is an Ohio "S" corporation meaning that the tax liabilities of the corporation flow directly through to Fisher. Fisher was always the sole shareholder of FDP.

> The Trustee presented evidence regarding Fisher's mismanagement of FDP. Fisher frequently commingled his funds with FDP's and treated FDP's debts as his own. He put FDP cash into his accounts and paid FDP expenses. He paid his own expenses from the commingled funds. One of the Trustee's experts, Robert Bowman, a former vice president of NCIC [an FDP lender], testified that Fisher literally bled the corporation of capital prior to its demise.

> Even Fisher had a difficult time remembering to distinguish between himself and his corporation during testimony. The documentary evidence regarding the potential sale and inventory transfer to Globe also supports the conclusion that Fisher and FDP were one and the same. Although the memoranda from Globe mention that FDP is a corporation, it is apparent that Fisher treated FDP as an *alter ego* when discussing [] Fisher's financial problems. The memorandum dated December 14, 2002 states that Fisher "is now prepared to go into bankruptcy as he feels he is doomed." Notably, the memorandum does not state that Fisher felt that FDP was doomed or that Fisher was contemplating bankruptcy for FDP, but only for himself.

> Based on that evidence and the total lack of evidence regarding Fisher's treatment of FDP as a separate entity, the court finds that FDP was Fisher's *alter ego*. The transfer of FDP's inventory in January 2003 to Brennan was a transfer from Fisher to Brennan.

Defendants do not contend that these findings were clearly erroneous, but argue that they suggest an improper shifting of the burden of proof to the defendants. We cannot agree that the bankruptcy court's statement that the trustee presented no evidence regarding the corporate formalities was anything more than a comment on the evidence. Nor are we persuaded that the bankruptcy court erred in finding that FDP was Fisher's *alter ego*.

### 3.        Fraudulent Transfer

Finally, defendants appeal from the finding that inventory was transferred to Brennan with "actual intent to hinder, delay, or defraud" any of Fisher's creditors. 11 U.S.C. § 548(a)(1)(A).   Despite evidence regarding Brennan's business expertise and financial resources, the bankruptcy court rejected the defendants' contention that Brennan purchased the inventory on her own, and concluded that:

> This transfer reeks of actual fraud.  There is abundant evidence that Fisher undertook careful pre-bankruptcy planning.  Part of that planning was clearly the removal of the inventory out of FDP and into Brennan's hands.  At deposition, Fisher testified to that simple fact[,] stating that he did not purchase the inventory himself because he knew that a future bankruptcy trustee would take the inventory.  Although Fisher directly refuted that testimony at trial, the court is sufficiently convinced that Fisher's deposition testimony was true. The court's impression of Fisher is that he is an adept business person who was both capable of and willing to reap every possible benefit from FDP prior to its demise—even if that required him to hatch a potentially fraudulent scheme to move the inventory to the person he was living with prior to filing bankruptcy.
>
> The Globe memoranda detailing Fisher's employment negotiations support this conclusion.  The memorandum dated December 24 and updated on December 26, 2002 states that Fisher "is arranging to take the raw stock" and that he "will get this deal done" without requiring Globe to purchase the inventory.  It is clear from the memoranda that Fisher is working on a deal to get the inventory to Globe at a reduced price and without requiring Globe to purchase the inventory directly.
>
> In addition to the above, it is also compelling that Fisher knew the inventory had a much greater value than National City Bank placed on it.  In his deposition, he testified that the value of the inventory was between $200,000 and $300,000, yet National City valued the inventory at just $3,000. Fisher clearly indicated in his deposition and his trial testimony that the inventory was a money-making opportunity.
>
> Finally, it is simply too convenient that the person Fisher was living with eventually purchased the inventory.  Fisher actually testified in court that

he was against Brennan's purchase, but given the deposition testimony and the remaining evidence before the court, this seems improbable. Given all the circumstances involved, the court finds that Fisher intentionally created a plan to keep the value of the inventory for himself by having Brennan purchase it.

For her part, Brennan was clearly a knowledgeable accomplice in Fisher's plan. Once again, the court does not question Brennan's business acumen and was impressed with both the testimony regarding her professionalism and her knowledge of the inventory. But, both Brennan and Fisher's testimony regarding the transfer was unbelievable. Not only did Brennan indicate that she was not aware of Fisher's financial status, but she also steadfastly claimed that it was her idea to purchase the inventory.

Brennan's testimony in this regard directly contradicts the Globe memoranda which indicate Fisher was planning on getting the inventory in some manner or another well before Brennan showed any interest. In addition, the Trustee produced evidence and Brennan verified that although she purchase the inventory [and shelving] for only $3,850, she immediately sold a portion of it for $10,326.11. Although Brennan went so far at trial as to testify that she was concerned over whether she would be able to get rid of the inventory, this testimony is also directly contra[di]cted by the Globe memoranda as well as common sense.

As of October 28, 2004, Brennan had sold inventory to Globe for the total amount of $99,128.65. There was no testimony on the exact portion of the inventory now on hand, but it is clear that some portion remains for Brennan to sell in the future. Brennan has not sold the inventory to any other purchaser and there is no indication that she will need to because Globe's needs are not abating.

All of these facts indicate to the court that Fisher and Brennan not only devised, but executed, a[n] effective plan to move the inventory from FDP for their benefit without having to sacrifice any of the inventory's value in Fisher's bankruptcy. The final piece of evidence regarding the inventory transfer that the court finds relevant is the information regarding Brennan's use of the proceeds from the sale of the inventory. Although a good portion of the proceeds were used for typical expenses, Brennan also used some of the money to pay former employees of FDP. Brennan insisted at trial that the payments were gifts and the court acknowledged that fact. But the amounts of the payments look very similar to payroll expenses. Although that was not proven at trial, there is enough evidence that supports the conclusion that Fisher and Brennan had empathy with the former employees who went unpaid

when FDP closed.

Based on the evidence, the bankruptcy court found that the sale of inventory to Brennan was fraudulent under § 548.

Defendants argue that this finding was based upon speculation and surmise, and defied the evidence presented at trial. Specifically, defendants insist that the Globe memoranda actually showed that Globe did not want to buy the inventory directly and that Fisher was simply attempting to negotiate a deal between National City and Globe. That is only part of what was shown, however. After Globe decided it did not want to buy it and National City did not want to take it, Globe understood that Fisher would arrange to secure the inventory so that it would be available for Globe to purchase "as needed." Yet, despite being the sole shareholder of FDP, Fisher did not take the inventory because he knew it would become part of the bankruptcy estate and the revenue expected from this money-making opportunity would be lost to his creditors. This is indeed indicative of actual fraud under § 548(a)(1)(A).

Next, defendants take issue with the bankruptcy court's statement that Fisher valued the inventory at $200,000 to $300,000, emphasizing that he actually testified the acquisition cost of the inventory was a "couple hundred thousand dollars." In that exchange, however, Fisher also acknowledged that Globe was given a balance sheet that showed raw materials valued at $230,000. Defendants claim that the appraisal was the only evidence as to the value of the inventory at the time of the transfer. On the contrary, the bankruptcy court could infer the value from the circumstances, including that Globe purchased more than $10,000

worth of inventory within two weeks of the sale to Brennan. The fact that the first sale of a portion of the inventory was for more than three times what Brennan paid for all of the inventory is evidence that the transfer was for less than reasonably equivalent value.[9]

Finally, defendants suggest that there could be no fraud because, as National City's representative testified, Fisher revealed that the inventory would be worth more than the liquidation appraisal value. Also, National City confirmed that it was willing to approve the sale of the inventory to any buyer for the appraised value. This, defendants argue, shows that Fisher did not make a misrepresentation or omission of material fact to National City. No misrepresentation is required for the trustee to avoid the transfer. The bankruptcy court did not clearly err in finding that Fisher and Brennan acted in concert to take advantage of the difference between the appraised value and the unique value to Globe—a patent holder—and that, in doing so, the inventory was transferred away from Fisher/FDP with actual intent to hinder, delay, or defraud Fisher's creditors.

Accordingly, the judgment of the bankruptcy court is **AFFIRMED**.

---

[9]This supports a finding of constructive fraud under § 548(a)(1)(B).